No. 87,192

STATE OF KANSAS, *Appellee*, v. LARRY DAVIS, *Appellant*.

(85 P.3d 1164)

Opinion filed March 19, 2004.

*Paige A. Nichols*, assistant appellate defender, argued the cause, and *Steven R. Zinn*, deputy appellate defender, was with her on the briefs for appellant.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Phill Kline*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J: This case comes before this court on the defendant's petition for review of the Court of Appeals' decision affirming his convictions and sentence for one count of aggravated kidnapping and one count of attempted rape in *State v. Davis*, No. 87,192, unpublished opinion filed September 19, 2003. Contrary to the Court of Appeals' decision, we conclude that defense counsel's inadequate representation of the defendant denied him a fair trial. We, therefore, reverse the defendant's convictions and remand for further proceedings.

The defendant was convicted in a bench trial on November 9, 2000. He appealed, and based upon his motion, the Court of Appeals remanded the case to the trial court for a determination of his allegations regarding his claim of inadequacy of representation. Upon conclusion of a hearing pursuant to *State v. Van Cleave*, 239 Kan. 117, 716 P.2d 580 (1986), the trial judge rejected the defendant's claims of inadequacy of representation, and the case resumed before the Court of Appeals. Ultimately, the Court of Appeals affirmed his convictions of aggravated kidnapping and attempted rape and his sentence of 554 months of imprisonment. We granted the defendant's petition for review.

In his petition for review of the Court of Appeals' decision, the defendant advances the same claims he raised before the district court. He claims that appointed defense counsel provided ineffective assistance of counsel based upon the following deficiencies:

1. Counsel's failure to seek a pretrial competency evaluation.

2. Counsel's failure to understand and apply the law regarding the defense of mental disease or defect.

3. Counsel's failure to argue that the abolition of the insanity defense violates due process.

4. Counsel's failure to inquire into a speedy-trial violation.

5. Counsel's failure to make a specific objection to criminal history.

The defendant also raises as separate errors of the trial court the above issues 3, 4, and 5.

At the time of trial, defendant Larry Davis was a 49-year-old man who suffered from schizophrenia, had a history of assaultive behavior, and had been committed to psychiatric hospitals on 31 occasions since the age of 13.

The defendant was released from his most recent hospitalization in June 1999, 2 months before the event giving rise to the present charges. The defendant had been assigned a case manager to ensure that he was taking his medication, but by mid-August the case manager was unable to find him. On August 20, 1999, the defendant received a week's worth of medication; at trial he testified he had stopped taking the medication because it made him impotent.

During the early morning hours of August 24, 1999, the defendant invited the victim, M.R., and Dallas Keller to his apartment to have a beer. M.R. was not acquainted with the defendant, but Keller knew him so she accompanied Keller into the apartment.

Keller and the defendant went into the kitchen for a private conversation. The defendant told Keller that M.R. was his girlfriend, that "he was going to get some," and that he wanted Keller to leave for a little while. Keller obliged, walking out the door; M.R. attempted to follow Keller, but the defendant immediately closed and locked the door. The defendant took her wrist, pulled her into the kitchen, grabbed a knife, and held it to her neck. He told her he was going to rape her. M.R. screamed, "Oh, God, no," and tried to pull away to the front door.

Keller was seated outside the door of the apartment and heard M.R.'s screams. He pounded on the door and demanded that the defendant open the door, but the defendant told him, "Get the hell away from my door." Keller left to find help but returned by himself, knocked on the door, and said he was a police officer. The

defendant still refused to open the door, so Keller called 911 and waited for the police.

M.R. continued screaming as the defendant pulled her toward the bathroom and cut open her shirt. Both of them ended up on the floor. The defendant straddled M.R, pinned her arms beneath his knees, and repeatedly punched M.R. in the face. At that time, two police officers knocked on the door and identified themselves. They heard a female inside who sounded like she was choking or gagging. The defendant told M.R. to go to the bathroom and warned her to be quiet. The defendant opened the door and told the officers that everything was okay and that he was just having an argument with his girlfriend. Noting that the defendant was only wearing jeans and sweating heavily, the officers asked the defendant to step outside his apartment and speak with them.

One of the officers observed M.R. standing inside the bathroom, holding a bra and shirt to cover her breasts. She was crying, had a swollen lip, and had red marks on her upper body. She told the officer, "He was trying to rape me." The defendant told the officer that M.R. had tried to rob him. The defendant was taken into custody and charged with aggravated kidnapping and attempted rape.

The defendant was initially found incompetent to stand trial and was transported to Larned State Security Hospital (Larned). Six months later, the defendant was deemed competent and trial proceedings resumed in May 2000. In August 2000, new counsel, Douglas L. Adams, Jr., was appointed to represent the defendant. In spite of mounting evidence of the defendant's incompetence, Adams did not request another competency evaluation prior to the November 9, 2000, bench trial. Moreover, Adams tendered an insanity defense that failed to apply K.S.A. 22-3220, which focuses upon a defendant's ability to form the necessary element of intent in the crimes charged. The defendant was convicted on both charges and sentenced to a controlling term of 554 months' imprisonment.

Upon appeal to the Kansas Court of Appeals, the defendant requested a hearing before the district court pursuant to *Van Cleave*, 239 Kan. 117, based upon his argument that his trial de-

fense counsel had provided ineffective representation. The Court of Appeals granted his motion, stayed the appeal, and remanded the case to the district court for a *Van Cleave* hearing.

The *Van Cleave* hearing was presided over by the same judge who conducted the defendant's trial. The defendant presented evidence that he was incompetent to stand trial at the time of his bench trial and that he was suffering from a mental disease or defect at the time of the charged offenses which rendered him incapable of possessing the required criminal intent to engage in the charged offenses of aggravated kidnapping and attempted rape. The district court rejected the defendant's contentions, concluding that he was not denied effective assistance of counsel. The district court also concluded that the abolition of the insanity defense was not unconstitutional, that defendant's speedy trial rights were not violated, and that the defendant's sentence was legal.

Upon the continuation of his appeal, a majority of the Court of Appeals affirmed the district court's determination that the defendant was not denied effective assistance of counsel, and a unanimous Court of Appeals rejected the other arguments advanced by the defendant. Judge Lewis dissented on the issue of ineffective representation but agreed with the majority on the other issues raised by the defendant. We granted the defendant's petition for review.

Based upon the following analysis, we conclude that the defendant was substantially prejudiced by defense counsel's inadequacy of representation in (1) failing to seek a pretrial competency evaluation and (2) failing to understand and apply the correct law regarding the defense of mental disease or defect.

### *Standard of Review*

"Before counsel's assistance is determined to be so defective as to require reversal of a conviction, the defendant must establish two things. First, the defendant must establish that counsel's performance was deficient. This requires a showing that counsel made errors so serious that counsel's performance was less than that guaranteed to the defendant by the Sixth Amendment to the United States Constitution. Second, the defendant must establish that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial."

"Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."

"With regard to the required showing of prejudice to the defendant in a claim of ineffective assistance of counsel, the proper standard requires the defendant to show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."

"Both the performance and prejudice prongs of the ineffective assistance of counsel inquiry remain mixed questions of law and fact on appeal. Where the trial court has made findings of fact and conclusions of law, an appellate court determines whether the decision reached by the trial court follows as a matter of law from the facts stated as its basis, and also whether the facts so stated have substantial support in the evidence." *State v. Orr*, 262 Kan. 312, Syl. ¶¶ 1, 2, 3, 4, 940 P.2d 42 (1997).

*(1) Counsel's failure to seek a pretrial competency evaluation*

The defendant has a long history of multiple hospitalizations and treatment for psychosis and disorganized/aggressive behavior. He was first treated at age 13 after threatening an individual with a pistol and was diagnosed with "borderline schizophrenic reaction." Throughout the following years, he has been hospitalized on over 30 occasions, some of them brief stays, others lasting for months, and one lasting for 7 years. His past diagnoses include schizophrenia, bipolar disorder, schizoaffective disorder, antisocial personality disorder, and borderline intellectual functioning.

Public Defender Terry Beall originally represented the defendant after he was arrested and charged on August 25, 1999. Shortly thereafter, the defense filed a notice to rely on an insanity defense and the related defense of diminished capacity and a motion to determine competency. On September 24, 1999, the court ordered the staff at Sedgwick County Mental Health (COMCARE) to determine whether the defendant was competent to stand trial; however, this evaluation was not conducted until November 1, 1999.

In the meantime, Beall engaged Dr. William Logan, a psychiatrist, to conduct a competency evaluation of the defendant in the Sedgwick County Jail on October 15, 1999. This evaluation included a 1-hour interview, review of the defendant's prior psychiatric records, the complaint, affidavits, and police reports relevant to this case. In addition to competency, Dr. Logan's report related to the defendant's ability to form the intent required in the offenses charged. Regarding his competency to stand trial, Dr. Logan concluded:

"Currently, he can work with his attorneys in the preparation of a defense and has an accurate understanding of the charges against him. Caution must be exercised, however, as Mr. Davis' illness is not well controlled on medication, and his paranoia, and psychotic thinking could easily escalate during the course of a trial. Based on his current ongoing symptoms and his history of decompensation under stress, it is unlikely he will be able to maintain his current level of capacity to stand trial through the stress of court proceedings."

On November 1, 1999, Dr. Margaret M. Weilert, a clinical psychologist at COMCARE, conducted a 2-hour interview with the defendant at the Sedgwick County Jail. Lauree Lusk, ARNP, advised Dr. Weilert that the defendant had been inconsistent in taking his prescribed medications, which are commonly used in the treatment of psychotic patients.

During the assessment of his competency to stand trial, the defendant was able to define competency and correctly name the charges and sources of the allegations against him. However, his first answer was closely followed by tangential accounts of the " 'animals' " in the detention system. When asked about evidence, he became more tangential and incoherent. When asked about possible consequences if he was found incompetent, he replied, " '[D]on't compute, don't compensate.' " He had extreme difficulty naming plea bargaining options, and his assessment of events leading up to his arrest were presented in a tangential, disorganized manner precluding comprehension.

The defendant correctly named and identified his attorney and gave adequate accounts of the roles and responsibilities of major courtroom personnel. However, he evidenced paranoia and distrust of the legal system, and when asked to describe the functions

of witnesses, he responded, " 'Clowns that come to the courtroom and want citizenship and citizen's arrest.' "

Dr. Weilert concluded that the defendant was incompetent to understand the nature and purpose of the proceedings against him and to assist in making his defense. While the defendant demonstrated some comprehension of the legal proceedings, "his unpredictable psychotic thought distortions, along with a pervasive paranoid delusional system, could seriously impede his ability to assist in making his defense."

After a November 10, 1999, hearing, the district court found the defendant was incompetent to stand trial and committed the defendant to Larned in an order filed on November 22, 1999. He was not transported to Larned until February 2, 2000.

While at Larned, Dr. Jean-Daniel Policard, a psychiatrist, (along with a social worker and psychologist) evaluated the defendant and submitted a forensic evaluation report dated April 24, 2000, which found the defendant competent to stand trial. Dr. Policard noted that the defendant had refused to comply with his medication regimen while in the county jail, but he had since reluctantly complied with his medication regimen, showing gradual but only modest improvement. The defendant had displayed episodes of verbal and physical hostility, threatened to strike staff members, and struck a social worker on the face several times when his request for money and cigarettes was not granted.

During the psychiatric evaluation, the defendant admitted to having a mental illness which he described as "schizophrenia with auditory hallucinations," and he acknowledged the need for medication. The defendant was diagnosed with schizoaffective disorder, bipolar type, antisocial personality disorder, and borderline intellectual function.

The defendant was aware of the nature and seriousness of the charges brought against him, as well as the respective roles of the major participants in the courtroom. He stated the judge "[s]entences, makes plans and disposition," the district attorney "prosecutes and tries to find me guilty," and the defense attorney "defends me." He defined plea bargain as "you confess to something and you get less time or parole," and he understood that he

should "communicate with my lawyer" who would speak on his behalf. The evaluating team concluded that the defendant had a fair understanding of the legal proceedings against him and would be able to assist his attorney in presenting a legal defense. The defendant was returned to the Sedgwick County Jail on April 27, 2000.

After a May 10, 2000, hearing, District Judge Rebecca L. Pilshaw filed an order on May 18, 2000, finding the defendant competent to stand trial and ordering the proceedings against the defendant to be resumed. On August 29, 2000, the district court appointed Richard Ney's law office to represent the defendant. Douglas Adams took over the case and obtained the records of the case from former counsel which included the defendant's mental health history.

Prior to trial in November 2000, the defendant wrote Adams four letters, which were partially incoherent. Adams described the following letter, dated September 15, 2000, as "very close to incomprehensible":

> "Now on this day Completivil Larry Davis Lawyer Appointed by the Sedggwick County Court: I makeing a motion For a maisstrial and a number of Post Phometrist and Detainners and Continunesse With Detainnerses that this Cass Distrc county court Falones casse From 29th 1999 29-2,000 HAS not reach the true Court with the proper Attorney Lawyer Criminel Not no Assessntis Deffend. If this is'nt over Ate then what it's sayin in the Gennenreal Entree is tru About judgv Owen thougt up a plan for me a Ohpretion Doc or Releass I would like to be Realses I was told 2 time this was in the Computer Gennarail Entree
>
> "Come and see me Are if not Im sooner with whate it said in the Genarail Etree."

Some of the letters demonstrated confusion about his defense. On October 1, 2000, the defendant wrote: "I would like to be acquitil couse of resoion of insanity mentily ill and that I may(?) not rsponsabel for myself . . . ." On October 26, 2000, the defendant wrote: "I'm not crazy like the D.A. and you trying to make me. I know this case is <u>bullshit</u>! Any lawer right out of school, could win this case." On November 3, 2000, the defendant wrote: "I like for you to use me being acquittle with defamation of capacity and

be civiley cometeded like to Ohwsawaterme Stat Hospital leis than 90 days and then back to condioneal releases."

Following the defendant's trial and the remand from the Court of Appeals, Adams testified at the *Van Cleave* hearing that he had no training in psychiatry, psychology, or in conducting mental health or competency evaluations. He admitted that he had reason to doubt the defendant's competency prior to trial based on the reports and the fact that the defendant had been found incompetent at least 6 or 7 months prior to going to court. Adams said that he would have sought another evaluation if he knew that the defendant was not complying with his medication regimen in jail, but he did not check with the jail to make this determination.

Adams indicated that the defendant was able to assist in the preparation of his defense and that he was better at certain times than others. The defendant communicated with Adams on several occasions and seemed to understand the roles of the major courtroom personnel. Adams admitted that he had no idea what level of doubt was necessary for him to seek a competency evaluation. Adams described the defendant before trial as "somebody that was on the cutting edge," and seemed to him that "at any time he could be a person that could go through a competency evaluation." Adams opined that he "just maybe missed the signs" and, after hearing Dr. Grinage's testimony, the defendant "should have probably had another evaluation."

The bench trial was held on November 9, 2000, before District Judge Joseph Bribiesca. At trial, the defendant again evidenced some confusion about his defense:

"Q. [By Prosecutor] Isn't it true what you want us to believe is that you didn't commit this crime because of your mental illness—
"A. No. No. No. No. No. My mental—
"Q. —is that right?
"A. My mental illness has nothing to do with this. Like I say, two—three— two—three wrongs don't make a right."

. . . .

"Q. [By Prosecutor] So you knew what you were doing that night, correct?
"A. Well—
"Q. Yes or no?

"A. No. No, I don't think I really did. I don't think I really did. Some— sometimes, like I say, I'm schizophrenia. Like I say, I was kind of—

"Q. So you didn't know what you were doing that night?

"A. I don't—like I said, I don't know. Like I said, what some of 'em probably say could be right. But, like I say, some ways I was—I was going and coming when the police got there especially."

After the Court of Appeals remanded for a *Van Cleave* hearing, appellate counsel engaged Dr. Bradley Grinage, the director of forensic psychiatry at the University of Kansas School of Medicine in Wichita, to evaluate the defendant's competency at the time of trial. On May 3, 2002, Dr. Grinage conducted a nearly 3 hour clinical interview and mental status examination of the defendant.

Dr. Grinage noted that the defendant had been found competent to stand trial after 2 months of medication in a highly structured inpatient psychiatric ward at Larned, but after the defendant was returned to the Sedgwick County Jail in April 2000, he was described as being noncompliant with medications and was experiencing ongoing auditory hallucinations that worsened in August 2000. This was important because virtually every time the defendant had been noncompliant with his medication in the past, he decompensated, became violent and aggressive in his psychotic state, and was not able to care for himself.

Dr. Grinage opined that the mood and nature of the letters the defendant sent to Adams before trial "reflected a lability of mood consistent with mania, which is associated with schizo-affective disorder." The jail records also noted that the defendant had a very low, normal Valproic level in his blood when he was returned to jail prior to trial. When he had been given medication to increase his Valproic level while at Larned, his mental state had improved.

Before allowing Dr. Grinage to express his opinion on the defendant's competency to stand trial, the court noted the doctor's comment that it was unusual to evaluate a defendant's competency for a time period in the past. The court instructed counsel to lay a foundation of whether it was a generally accepted psychiatric method to evaluate a person's competency for a specific time in the past and also questioned the doctor. Dr. Grinage's competency evaluation report concluded:

"At the time of his trial, it appears that the defendant had sufficient understanding of the nature and purpose of the proceedings against him. However, based on the information obtained in the course of this evaluation, it is the opinion of the examiner that, at the time of the trial, the defendant was suffering from a mental illness or defect such that his capacity to consult with his lawyer with a reasonable degree of rational understanding was significantly compromised. The opinion that the defendant lacked the capacity to make or assist in making his defense is based on a lengthy history of treatment resistant paranoia, documented medical noncompliance associated with increased psychotic symptoms in the jail, trial transcripts depicting the defendant's paranoid thought process and difficulty tracking conversation, and persistent psychotic symptoms noted after the trial."

The State did not present an expert to contradict this evidence at the *Van Cleave* hearing.

The defense argued that Adams was ineffective by failing to seek another competency evaluation based largely on the testimony of Dr. Grinage, but the district court rejected this argument, reasoning:

"Dr. Grinage is of the opinion that Mr. Davis was not competent to stand trial at the time of trial, nor was he able to form the requisite criminal intent at that time of the crime on account of suffering from a mental disease or defect, namely, schizo-affective disorder, bipolar type. The Court finds that based on Dr. Grinage's testimony, he himself stated that he basically agrees with Dr. Logan's examination findings with the exception of the two critical issues before the Court: namely, competency and ability to form criminal intent. In the Court's opinion, a difference of opinion between two experts under the present circumstances is insufficient to meet the defendant's burden under *Chamberlain* [*v. State,* 236 Kan. 650, 694 P.2d 468 (1985)]. In the Court's opinion, Dr. Grinage's opinion is not controlling, nor is it entitled to any more weight than Dr. Logan's or Dr. Policard."

The defendant argues on appeal that counsel was ineffective in failing to seek another competency evaluation prior to trial. The Court of Appeals' majority opinion specifically noted the change in the defendant's previous competency evaluations and the letters the defendant wrote to defense counsel prior to trial which indicated his confusion about his mental state. It also pointed to defense counsel's own testimony that although he doubted the defendant's competency and probably should have requested another evaluation prior to trial, he failed to investigate the issue any further by checking with a mental health professional or by inquiring into

whether the defendant had been taking his medication. The court concluded that it was clear from the record that defense counsel should have requested another competency evaluation prior to trial. However, the court did not find the required prejudice:

"We begin by noting that the trial at issue here was to the bench. It is clear that the trial judge was aware of the proper standard for the diminished capacity defense under K.S.A. 22-3220. The same judge that presided over the trial also heard the expert evidence at the *Van Cleave* hearing. The question is, if Adams had presented evidence that the defendant was not competent to stand trial, is there a reasonable probability the defendant would be found incompetent and if Adams had presented the defense using the correct standard under K.S.A. 22-3220, is there a reasonable probability the defendant would have been found not guilty?

"Because the trial judge also heard Dr. Grinage's opinion that the defendant was not competent at the time of trial, and did not find ineffective assistance of counsel, we conclude there is little or no probability this judge would have ruled differently had Dr. Grinage's opinion been presented just before or at trial."

Judge Lewis dissented from the majority opinion, concluding that the defendant was so prejudiced, he was denied effective assistance of counsel.

"A criminal defendant is incompetent to stand trial when, because of a mental illness or defect, the defendant is unable to understand the nature and purpose of the proceedings against him or her or where he or she is unable to make or assist in making a defense." *State v. Kleypas*, 272 Kan. 894, Syl. ¶ 32, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002); K.S.A. 22-3301(1)(a) and (b).

K.S.A. 22-3302(1) provides:

"At any time after the defendant has been charged with a crime and before pronouncement of sentence, the defendant, the defendant's counsel or the prosecuting attorney may request a determination of the defendant's competency to stand trial. If, upon the request of either party or upon the judge's own knowledge and observation, the judge before whom the case is pending finds that there is reason to believe that the defendant is incompetent to stand trial the proceedings shall be suspended and a hearing conducted to determine the competency of the defendant."

Although the statute uses permissive rather than mandatory language regarding defense counsel's obligation to seek a competency

evaluation, the " 'failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent . . . deprives him of his due process right to a fair trial.' " *Kleypas*, 272 Kan. at 990 (quoting *Drope v. Missouri*, 420 U.S. 162, 172, 43 L. Ed. 2d 103, 95 S. Ct. 896 [1975]). See *State v. White*, 263 Kan. 283, 314-16, 950 P.2d 1316 (1997).

It is clear in this case that Adams should have sought another competency hearing prior to trial. The defendant had an extensive history of mental illness and frequent commitments. Between October 1999 and April 2000, he vacillated between competency and incompetency to stand trial. Upon his first evaluation in October 1999, Dr. Logan opined that it was unlikely that the defendant could remain competent throughout the stress of a trial.

Only 2 weeks later, the defendant was found incompetent to stand trial, and he was only found competent after a highly structured stay at Larned 6 months before trial. He was then returned to the Sedgwick County Jail, where he was noncompliant with his medication and reported an increase in hallucinations a few months before trial. The defendant's letters to Adams prior to trial were at times incoherent and demonstrated confusion regarding his defense. Adams testified that if he had known the defendant was not taking his medication, he would have moved for another competency hearing. Counsel made no inquiry at the jail to determine whether the defendant was compliant with medication orders and no inquiry of health care professionals.

Adams admitted that he should have sought another competency hearing prior to trial. This admission is not based upon hindsight but is based upon Dr. Logan's report, the records available to counsel at the county jail, his own communications with the defendant around the time of trial, and the four letters the defendant sent to counsel. This evidence, together with a wealth of information concerning the defendant in the medical records counsel possessed, supports the Court of Appeals' conclusion that counsel's performance was deficient in failing to seek another competency hearing.

However, the court's ultimate conclusion that the deficiency did not prejudice the defense is not supported by the record. The Court of Appeals reasoned that because the same judge who pre-

sided over the trial heard Dr. Grinage's opinion at the *Van Cleave* hearing that the defendant was not competent to stand trial and did not find ineffective assistance of counsel, little probability existed that the judge would have ruled differently had this opinion been presented just before trial.

Our review of the record reveals that when the trial court was presented with uncontroverted evidence regarding the defendant's competency to stand trial, in November 1999 and May 2000, the court followed the opinions of the examining doctors. At the *Van Cleave* hearing, the same district judge weighed Dr. Grinage's assessment of incompetency to stand trial nearly 2 years after trial and displayed some concern about whether such posttrial evaluations were generally accepted psychiatric methods. The conclusion by the Court of Appeals that there "is little or no probability this judge would have ruled differently had Dr. Grinage's opinion been presented just before or at trial" amounts to speculation and a conclusion not supported by the evidence. Assuming that Dr. Grinage's testimony was given at the time of the defendant's trial and that the State would have presented no expert testimony refuting Dr. Grinage's opinion as it did in the *Van Cleave* hearing, it is difficult to conclude that Dr. Grinage's testimony would have had little or no effect on the judge. The judge questioned the value of 2-year-old testimony.

When such assumptions are coupled with the available evidence regarding the defendant's competency such as jail records of the defendant's failure to take his medication; evidence of recent hallucinations; the four letters sent to counsel before trial; and the reports of Dr. Logan, Dr. Weilert, and Dr. Policard, all to the effect that with medication the defendant might remain competent, the likelihood that Dr. Grinage's testimony of incompetence at trial would have carried the day is very real. At the very least, there is a reasonable probability that but for counsel's error in not requesting a competency hearing the result would have been different. The defendant's convictions must be reversed and the case remanded for a new trial before a different judge. While this conclusion may render the defendant's argument that he was incompetent at the time of trial moot, we elect to address this further allegation.

*(2) Counsel's failure to understand and apply the law regarding the defense of mental disease or defect*

Kansas legislatively abolished the insanity or diminished capacity defense with its enactment of K.S.A. 22-3220, which provides:

> "It is a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the mental state required as an element of the offense charged. Mental disease or defect is not otherwise a defense. The provisions of this section shall be in force and take effect on and after January 1, 1996."

During opening statements, Adams told the court that the defense theory was "not guilty by reason of insanity." Adams told the court that Dr. William Logan would testify about the defendant's history of mental illness and that Dr. Logan would opine "that [the defendant] was not able to understand the nature and quality of his acts at the time these acts were committed, and therefore, was legally insane at the time of the crime."

The only defense witnesses at trial were Dr. Logan and the defendant. After a preliminary examination, Adams asked Dr. Logan if he was able to "give a professional opinion as to whether based on all the other information you had in the case whether he might have had a diminished capacity or might have been legally insane at the time of his offense." The State objected on the grounds that "that's not the standard in the state of Kansas," and the court sustained the objection.

Adams then asked, "[W]ere you able to determine whether he had the state of mind required to commit the crime in this case?" The State's objection on foundation grounds was sustained. Adams asked if "the Court could give us some guidance with respect to the foundation that we're required to come up with in this situation," and the judge replied, "You want me to tell you what to do?" Adams told the court that he was looking at the insanity statute and PIK Crim. 3d 54.10 for crimes committed after January 1, 1996, and the court told him that he had not established whether the doctor was aware of what the law states.

Adams asked Dr. Logan if he was aware of the state law with respect to a person's mental capacity to commit a crime and his opinion with respect to that issue related to the defendant. Dr.

Logan articulated the proper standard, recognized that the defendant suffered from schizophrenia, but testified that he did not see a relationship between the defendant's mental illness and the crime. He concluded that the defendant *did* have the mental state required to form an intent to commit the crime.

Shortly thereafter, Adams again asked Dr. Logan if he understood the "law of diminished capacity." The State objected again, arguing that "that's not the law in Kansas any longer," and the trial court sustained the objection.

In arguing for a judgment of acquittal, Adams tried to salvage the mental disease or defect defense by arguing, "[E]ven if Dr. Logan doesn't come to the conclusion, I think the Court certainly can, that he did not have the state of mind required to commit the crime."

At the *Van Cleave* hearing, Adams described his performance as follows:

> "I did a very poor job during the course of the testimony of Dr. Logan in bringing out what I was trying to get him to say. I recognized that when I looked at the transcript. It's horrific when I consider what I should have done. But eventually in cross examination . . . he goes on there about what if you assume what Larry Davis says is true, then perhaps there is a possibility he could have been incapable of forming the intent. That's where I was trying to go with it."

Adams explained that even though he started with the wrong legal standard, he eventually attempted to apply the correct standard.

In his competency evaluation report, Dr. Grinage opined that the defendant, as a result of mental disease or defect, specifically schizoaffective disorder, bipolar type, was incapable of possessing the required criminal intent to engage in aggravated kidnapping or attempted rape. He based this opinion on the defendant's long history of treatment-resistant paranoia, documented noncompliance with medication prior to the alleged offense, significant alcohol and cocaine use prior to the alleged offense, and noted paranoid delusions and problems with thought processing after his arrest.

The defendant argues that he was deprived of effective assistance of counsel when Adams failed to show an understanding or

present a solid defense of not guilty by reason of mental disease or defect. The Court of Appeals concluded:

"Adams clearly did not adequately prepare for trial because he was unaware of the proper legal standard for a defense of mental disease or defect, which clearly falls below a level of reasonableness. The defendant's only expert aided the State in his opinion that the defendant had the required state of mind to commit the crimes. This testimony was uncontroverted by any other expert. Adams failed to adequately research and prepare for trial and did not seek another expert opinion. Consequently, it is clear that Adams' performance clearly fell below the level of competence required by the Sixth Amendment."

However, a majority of the court concluded that the defendant had not satisfied the prejudice prong:

"Similarly, the judge also heard evidence at trial and at the *Van Cleave* hearing concerning whether or not the defendant possessed the requisite mental state required as an element of the crime charged, *i.e.*, whether he could form the *mens rea* to commit the crime. See *State v. Henry*, 273 Kan. 608, 44 P.3d 466 (2002) (if the mental defect or disease was such that it negated the *mens rea* element of the crime). Given the record, we are convinced it is improbable that the trial judge, being fully aware of the standard involved for K.S.A. 22-3220, would have found the defendant not guilty based on his mental disease or defect."

Judge Lewis dissented from the majority, reasoning that he had "never seen a more incompetent performance by an attorney in a case like this." He cited to Adams' unawareness of the correct standard of the mental disease or defect defense, his eliciting testimony from his own expert damaging to the defense, his admission that he was confused about the correct standard, his admission that his questioning of Dr. Logan was "horrific," and his failure to have the defendant reexamined prior to trial.

Adams did not adequately prepare for trial because, by his own admission, he was unaware of the proper legal standard for a defense of mental disease or defect. In this regard, his performance was deficient. However, the majority opinion's conclusion that this deficiency did not meet the prejudice prong of the ineffective assistance inquiry is incorrect.

It is important to note that Adams elected to call Dr. Logan as his only expert defense witness. Not only was Adams unaware of the correct standard to be applied, but Dr. Logan's competency evaluation report available to Adams before trial clearly indicated

that if he were asked the question concerning the defendant's mental state and competency, he would testify consistent with the conclusion in his report dated December 20, 1999: "In conclusion, Mr. Davis had a major mental illness, Schizophrenia, at the time of the offense, which would have compromised his ability to exercise some control of his behavior, *but otherwise did not appear to impair his ability to deliberate or form intent.*" (Emphasis added.)

Had counsel understood the correct legal standard to be applied, counsel would have attempted to secure an expert witness whose testimony would not destroy the very defense he was attempting to establish. He would have at the very least tried to find another expert witness to testify that the defendant was incapable of forming the intent to commit the charged crimes, such as Dr. Grinage. It is beyond question that counsel would not have called Dr. Logan as a witness for the defendant.

While the district court had the opportunity to consider Dr. Grinage's testimony during the *Van Cleave* hearing, the court questioned whether such evidence expressing an opinion concerning events that occurred almost 2 years after the trial had any value. Had Dr. Grinage's opinion been presented at trial it would have had the potential of changing the result of the trial. This would even be more likely had defense counsel not called Dr. Logan at trial. The Court of Appeals' conclusion that it was "improbable that the trial judge [hearing the evidence at trial and at the *Van Cleave* hearing], being fully aware of the standard involved for K.S.A. 22-3220, would have found the defendant not guilty based on his mental disease or defect" is in itself improbable. On those occasions where the trial court was presented with uncontroverted evidence regarding the defendant's competency, the trial court relied upon the expert testimony. Had the trial court had available Dr. Grinage's opinion or an opinion similar to his at the time of trial with no evidence presented by the State, it is probable that the trial court would have relied upon such an opinion and testimony notwithstanding Dr. Logan's report which had been rendered almost a year before the trial.

Under the totality of the evidence in the record, the defendant was denied effective assistance of counsel, was prejudiced by the ineffective assistance of counsel, and as a result was deprived of a fair trial. See *State v. Washington*, 275 Kan. 644, 679-80, 68 P.3d 134 (2003) (defense counsel who was not aware of statutory provisions relating to hard 50 sentence and failed to present any response was ineffective, even though trial court was "on board throughout the process and therefore considered all the evidence"). While the findings of fact and conclusions of law of the district court were made, the decision reached and affirmed by the Court of Appeals on this issue does not follow as a matter of law from the facts stated as its basis. The decision of the Court of Appeals must be reversed and the case remanded to a new district court judge for further proceedings.

*(3) Counsel's failure to argue that the abolition of the insanity defense violates due process*

The defendant argues that he was denied due process by the abolition of the insanity defense and counsel was ineffective in failing to raise this issue before the district court. The defendant acknowledges that his claims were rejected by this court in *State v. Bethel*, 275 Kan. 456, 66 P.3d 840 (2003), *cert. denied* 157 L. Ed. 2d 412 (2003), but he asks this court to reconsider *Bethel* without providing any further argument.

In *Bethel*, this court recently addressed the defendant's argument and discussed *Finger v. State*, 117 Nev. 548, 27 P.3d 66 (2001), *cert. denied* 534 U.S. 1127 (2002); *State v. Searcy*, 118 Idaho 632, 798 P.2d 914 (1990); *State v. Korell*, 213 Mont. 316, 690 P.2d 992 (1984); and *State v. Herrera*, 895 P.2d 359 (1995), at length. The court declined to follow the reasoning in *Finger* and found the reasoning of the other cases more persuasive. The court concluded that K.S.A. 22-3220 does not violate the Due Process Clauses of the United States or Kansas Constitutions. *Bethel*, 275 Kan. at 473. It concluded that as long as the prosecutor was required to prove beyond a reasonable doubt every element of the offense charged, due process is not violated. K.S.A. 22-3220 simply allows a defendant to present evidence tending to show that he or

she lacked the mental state required for the offense charged. 275 Kan. at 474.

The defendant provides no additional authority as to why *Bethel* should be reconsidered. Consistent with *Bethel*, we conclude that the defendant's due process rights were not violated by the abolition of the insanity defense. It follows that counsel was not ineffective by failing to raise this issue before the district court.

*(4) Counsel's failure to inquire into speedy-trial violation*

Because of the defendant's extensive record of psychiatric commitments, a major concern before trial was his competency to stand trial. We conclude that most of the delay in bringing the defendant to trial related to his mental condition. For this reason and for the reasons set forth below, we conclude that the defendant was not denied his statutory or constitutional right to a speedy trial. It necessarily follows that his defense counsel was not ineffective for failing to raise this issue before the district court.

The facts are not in dispute, and "[t]he question of whether there is a violation of statutory and constitutional rights to a speedy trial is a matter of law over which this court has unlimited review." *State v. White*, 275 Kan. 580, 598, 67 P.3d 138 (2003).

The following chronology of events is relevant to this issue:

| | |
|---|---|
| August 24, 1999 | Arrest. |
| August 25, 1999 | Complaint. |
| September 8, 1999 | Arraignment. |
| September 13, 1999 | Notice of Intent to Rely on Insanity Defense. |
| September 22, 1999 | Defendant's Motion to Determine Competency. |
| September 24, 1999 | Order for Competency Exam. |
| November 22, 1999 | Order of Incompetency to Stand Trial Pursuant to K.S.A. 22-3303(1) (Hearing was on November 10, 1999.) |
| February 2, 2000 | Defendant transported to Larned State Hospital. |
| March 2, 2000 | Defendant's pro se Motion for Appointment of Counsel. |

| | |
|---|---|
| April 27, 2000 | Notification from Larned State Hospital of Defendant's change in status—defendant is transported back to jail. |
| May 18, 2000 | Order of Competency—Defendant attempts to raise speedy trial pro se (Hearing was on May 10, 2000.) |
| June 5, 2000 | Jury trial waiver—Defense agrees to set trial on June 28, 2000. |
| June 28, 2000 | Continuance at Defendant's request. |
| August 30, 2000 | Continuance at Defendant's request. |
| September 27, 2000 | Continuance at Defendant's request. |
| October 4, 2000 | Continuance at Defendant's request. |
| November 9, 2000 | Bench trial. |

*Statutory Right to Speedy Trial*

The statutory time period for a speedy trial starts on the date of arraignment. The State is obligated to ensure the accused is provided with a speedy trial, and the defendant is not required to take any affirmative action to see this right is observed. *White*, 275 Kan. at 598.

K.S.A. 22-3402 provides in relevant part:

"(1) If any person charged with a crime and held in jail solely by reason thereof shall not be brought to trial within ninety (90) days after such person's arraignment on the charge, such person shall be entitled to be discharged from further liability to be tried for the crime charged, unless the delay shall happen as a result of the application or fault of the defendant, or a continuance shall be ordered by the court under subsection (3).

. . . .

"(3) The time for trial may be extended beyond the limitations of subsections (1) and (2) of this section for any of the following reasons:

(a) The defendant is incompetent to stand trial;

(b) A proceeding to determine the defendant's competency to stand trial is pending and a determination thereof may not be completed within the time limitations fixed for trial by this section."

K.S.A. 22-3303(1) provides in relevant part:

"A defendant who is charged with a felony and is found to be incompetent to stand trial shall be committed for evaluation and treatment to the state security hospital or any appropriate county or private institution. . . . Any such commitment shall be for a period of not to exceed 90 days. Within 90 days after the

defendant's commitment to such institution, the chief medical officer of such institution shall certify to the court whether the defendant has a substantial probability of attaining competency to stand trial in the foreseeable future. If such probability does exist, the court shall order the defendant to remain in an appropriate state, county or private institution until the defendant attains competency to stand trial or for a period of six months from the date of the original commitment, whichever occurs first."

The disputed time period in this case ranges from February 20, 2000 (90 days after the November 22, 1999, court order finding the defendant incompetent to stand trial and committing him to Larned) and June 5, 2000 (when the defendant waived a jury trial and agreed to a bench trial on June 28, 2000). The defendant contends that once 90 days had passed after the order of incompetency (November 22, 1999) and his commitment to Larned (February 2, 2000), the speedy-trial clock resumed running against the State (on or about February 20, 2000). The defendant reasons that the district court's failure to issue any order validating his continued commitment beyond the 90-day statutory time limit as required by K.S.A. 22-3303(1) prohibits continued classification of the defendant as incompetent for purposes of applying the speedy-trial exception for incompetency.

The order of incompetency to stand trial filed on November 22, 1999, ordered that the defendant "is hereby *committed* to the Larned State Security Hospital, Larned, Kansas, for a period of not more than ninety (90) days from the defendant's *admission* to the hospital pursuant to the appropriate provisions of K.S.A. 22-3303." (Emphasis added.)

The interpretation of K.S.A. 22-3303(1) advanced by the defendant ignores the fact that the time clock on his statutory right to a speedy trial would be running at a time when the defendant had been declared incompetent to stand trial. Moreover, such an interpretation ignores the fact that the 90 days' commitment to Larned had not expired. Such an interpretation is contrary to the intent of the legislature.

The purpose of K.S.A. 22-3303(1) is to allow ample time, 90 days, to address the defendant's competency to stand trial. Thus, the time period of 90 days does not begin until the defendant is

actually admitted into the hospital. Consistent with legislative intent, the full 90 days is available to determine whether the defendant is reasonably likely to be able to stand trial. If we were to accept the defendant's interpretation that the 90 days runs from the date of the commitment order, the state security hospital or any appropriate county or private institution would have less than the 90 days set forth in K.S.A. 22-3303(1) to evaluate a defendant on the very important issue of competency. Also in this case, time assessed against the State would not include a period of time when the defendant was incompetent to stand trial and could not be tried until he was declared competent to stand trial.

The 90-day time frame for evaluation and treatment of the defendant in this case did not begin running until the defendant was admitted to Larned on February 2, 2000, making the 90-day period expire on May 2, 2000. The defendant was deemed competent to stand trial by Dr. Policard at Larned on April 24, 2000, and on April 27, 2000, the defendant was returned to the Sedgwick County Jail. Thus, the defendant was not committed beyond the 90-day statutory limit at Larned, and this time would be properly charged against the defendant. See K.S.A. 22-3402(3).

While the time charged against the defendant in this case includes the time between the order of commitment and defendant's commitment as well as other delays, all the delays relate to the defendant's incompetency to stand trial. The defendant has provided no authority, nor has research revealed any Kansas authority, that the failure to enter an order pursuant to K.S.A. 22-3303 affects speedy-trial issues when competency is at issue.

To the contrary, Kansas authority charges any delay in the proceedings reasonably associated with a challenge to competency to the defendant:

"[T]he time between filing and the decision on a competency hearing motion is chargeable to the defendant when the decision is made within a reasonable time period. The filing of a notice of intent to rely on the insanity defense also operates as a waiver of the requirements of K.S.A. 22-3402 if trial delay was reasonably occasioned by the assertion of the insanity defense. [Citation omitted.] The time between the filing of a motion for a psychiatric examination and the date on which the psychiatrist's report is received is chargeable against the defendant. [Citation omitted.]" *State v. Bafford*, 255 Kan. 888, 892, 879 P.2d 613 (1994).

Thus, under *Bafford* and K.S.A. 22-3402(3), the defendant was charged with the time between the November 22, 1999, declaration of incompetency and the April 28, 2000, receipt of the Larned evaluation report which advised that the defendant's competency had been restored. We conclude that the defendant was not denied his statutory right to a speedy trial.

*Constitutional Right to Speedy Trial*

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, and § 10 of the Kansas Constitution Bill of Rights guarantee an accused the right to a speedy trial. The Kansas Legislature adopted K.S.A. 22-3402 to define and implement these constitutional guarantees. Where the statutory right to speedy trial does not apply, an accused is still guaranteed the right to a speedy trial under both the United States and Kansas Constitutions. *State v. Mann*, 274 Kan. 670, 700-01, 56 P.3d 212 (2002).

The United States Supreme Court set forth a balancing test for determining whether an accused has been denied his or her constitutional right to a speedy trial in *Barker v. Wingo*, 407 U.S. 514, 33 L. Ed. 2d 101, 92 S. Ct. 2182 (1972). Kansas adopted this test in *State v. Otero*, 210 Kan. 530, 532-36, 502 P.2d 763 (1972). The following factors for making the determination were set forth in *Barker*: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right; and (4) prejudice to the defendant. 407 U.S. at 530; *Mann*, 274 Kan. at 701.

The length of the delay between arrest and trial is key to the analysis. Until the delay rises to the level of being presumptively prejudicial, it is not necessary to inquire into the other *Barker* factors. *Mann*, 274 Kan. at 701.

In this case, the Court of Appeals concluded that the 15-month delay between the time of the defendant's arrest and the date of trial was not presumptively prejudicial, citing this court's opinion in *State v. Goss*, 245 Kan. 189, 777 P.2d 781 (1989). *Goss* determined that "a little over a year" between arrest and trial is not presumptively prejudicial under a constitutional speedy-trial analysis. 245 Kan. at 193. Here, the Court Appeals concluded that the

time between the defendant's arrest and trial was not presumptively prejudicial when the competency issues needed to be addressed.

However, in *State v. Weaver*, 276 Kan. 504, 78 P.3d 397 (2003), the Court of Appeals held that a nearly 15-month delay between arrest and trial in a possession of cocaine with intent to sell case qualified as "a little over a year" under *Goss*, thereby negating further analysis of the *Barker* factors.

On petition for review, this court found that the Court of Appeals mistakenly treated *Goss* as establishing a set period of time that would never constitute a presumptively prejudicial delay. *Weaver* found that the mere passage of time is not determinative of whether the length of delay was presumptively prejudicial, but the peculiar circumstances of each case must be considered as well. 276 Kan. 504, Syl. ¶ 3. The *Weaver* court used the following circumstances in concluding that the 15-month delay was presumptively prejudicial and that consideration of the three remaining *Barker* factors was warranted:

> "Weaver's crime was one count of possession of cocaine with intent to sell. The State's case against him was simple and straightforward—police found on Weaver crack cocaine packaged in individual units and $265 cash, including 12 $20 bills. The State's evidence against him was presented in 64 transcript pages of testimony. The tolerable delay for an ordinary crime is less than for a complex one. [*Barker*,] 407 U.S. at 531. Further, Weaver was not arraigned until 123 days after his arrest, and another 176 days passed before Weaver's counsel asked for and was granted a continuance of the trial date. Two hundred and ninety-nine days passed in which no attempt was made to try the defendant." 276 Kan. at 510-11.

In this case, the defendant was charged with aggravated kidnapping and attempted rape. The State's evidence against the defendant was straightforward, involving the testimony of two police officers, the victim, and Keller, and the entire trial lasted only 1 day. However, the defendant's challenge to his own competency made this case more complex and naturally required more time to resolve.

The defendant was arraigned approximately 2 weeks after arrest, and he filed his notice to rely on the insanity/diminished capacity defense 5 days later on September 13, 1999. The defendant was

initially found incompetent to stand trial in November 1999, and K.S.A. 22-3303(1) contemplates that the defendant may be committed from 90 days to 6 months in order to regain competency. The defendant was found competent to stand trial in May 2000. However, the time period from June 5, 2000, to November 9, 2000, is all attributable to the defense based on its request for a June 28, 2000, trial date and then for multiple continuances. As such, the Court of Appeals properly concluded that a period of 15 months between the defendant's arrest and trial in this case was not presumptively prejudicial when the competency issues needed to be addressed.

Even if we were to conclude that a delay of 15 months and 8 days is presumptively prejudicial, a consideration of the *Barker* factors would yield the same result. Under the second *Barker* factor, the defendant argues the reasons for the delay were attributable to the committing institution's failure to issue the requisite 90-day certification and the district court's failure to make any orders authorizing the defendant's continued commitment. We have rejected this contention in our determination that the defendant's statutory speedy trial was not violated. The bulk of the delay, other than for competency evaluations, was the nearly 5 months requested by the defense between June 5, 2000, and November 9, 2000. Thus, this second factor weighs against the defendant.

Under the third *Barker* factor, the defendant contends he asserted his right to a speedy trial at his May 10, 2000, competency hearing when the district court was scheduling a jury trial. At that time, the defendant stated,

> "Jury trial? No, Judge, I want—I am tired of these people. In other words, hold me back on the bench trial. I ask for a bench trial, ask for a speedy trial, another attorney for a speedy trial and take care of all of these things. And also what I'm saying is I asked for a speedy trial; I am entitled to a speedy trial. A bench trial is what I asked for."

However, in this exchange, it does not appear that the defendant was asserting that his speedy trial rights had been violated. Rather, he was trying to convince the judge not to order a jury trial because he thought that a bench trial would be faster. This third factor also weighs against the defendant.

Under the fourth *Barker* factor, the defendant argues he was prejudiced by being subjected to the discomfort and opprobrium of a prolonged and unauthorized commitment. See *State v. Fitch*, 249 Kan. 562, 566, 819 P.2d 1225 (1991) (impairment of defendant's capacity to conduct a defense only one form of prejudice which may flow from long delay in bringing charges to trial; "burden of anxiety" may be form of prejudice). The defendant also argues that the delay contributed to faded memories at trial, pointing to the victim's inability to remember whether the defendant was wearing clothes during the attempted rape, what she reported to the police, and how many times she went to the defendant's apartment that night.

It is noted that the defense obviously was not worried about this possible prejudice from June 2000 until November 2000 because it requested several continuances. While the defendant may have suffered some discomfort and anxiety during the time he spent at Larned after February 2, 2000, he actually benefitted from the highly structured environment and showed modest improvement in his mental well-being. Likewise, it is difficult to see how the victim's inability to remember certain details of the event would prejudice the defendant, who was seeking to attack her credibility. We conclude that the defendant's constitutional right to a speedy trial was not violated.

The criminal history error raised by the defendant need not be addressed based upon our decision to reverse and remand.

The decision of the Court of Appeals affirming the trial court is affirmed in part and reversed in part, and the case is remanded to a new trial judge for further proceedings; the decision of the trial court is affirmed in part and reversed in part.