NOT DESIGNATED FOR PUBLICATION

No. 121,535

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

DAVIN RICHARD SPRAGUE,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Saline District Court; EDWARD E. BOUKER, judge. Opinion filed January 29, 2021.
Affirmed.

*David L. Miller*, of Ney, Adams & Miller, of Wichita, for appellant.

*Jeffery Ebel*, assistant county attorney, *Amy E. Norton*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., BRUNS and SCHROEDER, JJ.

PER CURIAM: Using a shotgun approach in his brief, Davin Richard Sprague raises almost two dozen issues in this appeal of the court's denial of habeas corpus relief. He lodges complaints about his trial counsel as well as his appellate counsel. Our review reveals no reversible errors, however, and we affirm.

*The case history provides a context for our ruling.*

A jury found Sprague guilty of premeditated first-degree murder for killing his wife, Kandi Sprague. On July 23, 2010, Kandi told her mother she was thinking of divorcing Sprague. Kandi had met another man—Steven Peacock—online. That day, Sprague had taken Kandi's cell phone and called Peacock. Peacock told Sprague that he had been led to believe Kandi was divorced. Later that evening, Kandi talked online almost until midnight to Peacock and a woman she had also met online, Jennifer Helm. Kandi was not heard from again.

The next day, Sprague told his family, friends, and law enforcement officers that Kandi had left him for another man. But by August 1, 2010, police officers believed there was foul play involved. They obtained and executed a search warrant on Sprague's property. They came back and finished their search on August 2 and discovered Kandi's body buried under the dirt floor of a building located on the property.

When he faced this discovery, Sprague told police that Kandi had come out to the building where he was working and attacked him. He said he defended himself by hitting her on the head with a pipe. Kandi was much larger than Sprague. He said that Kandi fell and "a bunch of blood and shit started coming out of her mouth." He believed she was in pain, so he took a rope and strangled her until the "pain was gone." He then spent eight hours digging up the hard-packed dirt floor and buried her. During his police interview, Sprague repeatedly stated that he believed Kandi was possessed by a demon because of some lumber that his grandfather had brought over from a house in Abilene.

Before trial, Paul Hickman and Pamela Sullivan from the Saline County Public Defender's Office were appointed to represent Sprague. Sprague was evaluated and found competent to stand trial. Hickman and Sullivan hired a psychologist, Dr. George Hough, to evaluate Sprague's mental health. They also hired a forensic pathologist, Dr. Corrie

May, to evaluate Kandi's autopsy and cause of death. Neither doctor testified at trial. The public defenders eventually withdrew from representing Sprague. The court then appointed Julie Effenbeck to represent Sprague at trial.

At trial, Erik Mitchell, a forensic pathologist and medical examiner, testified that Kandi had two separate fractures to her skull in the back of her head. Mitchell testified there was a "very good chance" the head injuries were survivable. When he was asked whether Kandi could have died from strangulation, Mitchell testified that strangulation could have been a supervening cause of death, but there was no physical evidence of strangulation.

Sprague was convicted of premeditated first-degree murder and the conviction was affirmed on appeal. Heather Cessna represented Sprague in his direct appeal. *State v. Sprague*, 303 Kan. 418, 362 P.3d 828 (2015). Sprague timely filed a K.S.A. 60-1507 motion alleging his trial and appellate counsel were ineffective. The district court held a two-day evidentiary hearing. Ultimately, the district court denied the motion. Sprague now brings this 24-issue appeal.

To make Sprague's arguments understandable, we have formed them into three general groups. First, we examine his claims about the pretrial failures of his counsel. Next, we review Sprague's numerous trial error contentions. We have organized them into three subgroups: failure to offer certain evidence, failure to object to certain evidence, and failure to offer impeachment evidence. In the second group, we look at Sprague's claim of his trial counsel waiving his right to testify. In the third group of claimed errors, we examine the various contentions Sprague makes about the failures of both trial and appellate counsel to make certain legal arguments.

*The rules we follow*

Sprague only makes ineffective assistance of counsel claims. When a district court conducts an evidentiary hearing on claims of ineffective assistance of counsel, as here, we review the court's factual findings using a substantial competent evidence standard. Appellate courts review the district court's legal conclusions by applying a de novo standard of review. *State v. Butler*, 307 Kan. 831, 853, 416 P.3d 116 (2018).

To prevail on a claim of ineffective assistance of trial counsel, a criminal defendant must establish

- that the performance of defense counsel was deficient considering all of the circumstances; and
- prejudice:  that there is a reasonable probability the jury would have reached a different result absent the deficient performance.

*State v. Salary*, 309 Kan. 479, 483, 437 P.3d 953 (2019).

Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel is highly deferential and requires consideration of all the evidence before the judge or jury. The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014).

If counsel has made a strategic decision after making a thorough investigation of the law and the facts relevant to the realistically available options, then counsel's decision is virtually unchallengeable. Strategic decisions made after a less than comprehensive investigation are reasonable exactly to the extent that reasonable professional judgment supports the limitations on the investigation. *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013) (quoting *Strickland v. Washington*, 466 U.S. 668, 690-91, 104 S. Ct. 2052, 80 L. Ed. 2d 674 [1984]).

To establish ineffective assistance of counsel on appeal, a defendant must show that

- counsel's performance, based on all of the circumstances, was deficient in that it fell below an objective standard of reasonableness; and
- the defendant was prejudiced to the extent that there is a reasonable probability that, but for counsel's deficient performance, the appeal would have been successful.

*Miller v. State*, 298 Kan. 921, 930-31, 934, 318 P.3d 155 (2014).

**Alleged pretrial failures**

Sprague raises four issues in this group. First, he complains of trial counsel's failure to move to suppress evidence. Next, we examine his argument concerning counsel's failure to move to suppress Sprague's statements to the police. After that, we look at his claim that counsel failed to investigate and present a mental disease or defect defense. Finally, we review Sprague's criticism of his counsel's failure to ask for a second competency examination.

*Failure to move to suppress evidence from the police search*

Sprague contends that his trial attorneys were ineffective for failing to move to suppress evidence under the "one warrant, one search" rule—a rule that has not been adopted in Kansas. Even so, he argues that his counsel had a duty to raise it. In his view, the search of his property was complete when the officers left on August 1, and the officers needed a new warrant to search on August 2. More details are important here.

On August 1, 2010, Investigator Michael Rogers searched the outside premises of Sprague's property, including a shed or "Morton building." The Morton building had a dirt floor covered with rugs. Rogers noticed some loose fill dirt that caught his attention.

5

But it was after 8 p.m. and Rogers left for the evening because it was dark, and he had to serve a subpoena elsewhere. Rogers had personally searched Sprague's property for about four hours. Other officers had been searching the premises "for some time" before Rogers arrived. The scene was secured by law enforcement officers overnight. There was at least one deputy there all night.

Rogers thought about the fill dirt overnight and returned at 9 a.m. the next morning to look at that spot again. That is when he discovered Kandi's body. At the K.S.A. 60-1507 hearing, Rogers testified the search was not completed when he left on August 1.

We question whether this is really a failure on the part of trial counsel. No Kansas court and no statute has adopted the "one warrant, one search" rule. Attorneys representing criminal defendants are held to an understanding of current Kansas law, not the law of another jurisdiction. Failure to advance new theories does not typically render a trial lawyer's performance constitutionally deficient. *Tomlin v. State*, 35 Kan. App. 2d 398, Syl. ¶¶ 5-6, 130 P.3d 1229 (2006).

At the core of the "one warrant, one search" rule is reasonableness. Most jurisdictions that have considered the question have said that "a warrant may be executed only once." *Braund v. State*, 12 P.3d 187, 193 (Alaska App. 2000). Thus, even where a statute gives officers four days to execute a warrant, police cannot repeatedly enter and search a residence at will until the warrant expires. See *Braund*, 12 P.3d at 193, n.12 (collecting cases); 79 C.J.S. Searches § 260; 2 LaFave, Search & Seizure § 4.10(d) (6th ed. 2020). If the officers could make an indefinite number of searches during the four days, the warrant "could become a means of tyrannical oppression in the hands of an unscrupulous officer to the disturbance or destruction of the peaceful enjoyment of the home or workshop." *McDonald v. State*, 195 Tenn. 282, 284, 259 S.W.2d 524 (1953).

Those jurisdictions consider a second search under the same warrant unreasonable. 195 Tenn. at 284.

But those jurisdictions have largely held that a second entry onto the premises under the same search warrant is permissible if it is a reasonable continuation of the original search. The second entry must be a continuation of the earlier search and it must be reasonable under the circumstances. *United States v. Keszthelvi*, 308 F.3d 557, 568 (6th Cir. 2002) (collecting cases); 79 C.J.S. Searches § 260; 2 LaFave, Search & Seizure § 4.10(d) (6th ed. 2020); *The Warrant Requirement*, 37 Geo. L.J. Ann. Rev. Crim. Proc. 20, 36 n.90 (2008). A search that cannot be completed in one day and is resumed the next day is one continuous search. 79 C.J.S. Searches § 260.

We see no prejudice to Sprague here. This was a continuous search that could not be completed in one day. We cannot criticize a lawyer for failing to raise an issue that is not supported by the law. We hold that this is not reversible.

*Failure to suppress Sprague's statements to the police*

Sprague contends that his trial attorneys were ineffective for failing to move to suppress his confession as involuntary because of his delusional mental state. He argues he lacked the capacity to waive his *Miranda* rights.

The record reveals that none of his trial counsel asked for the suppression of his statements. Officers interviewed Sprague on August 1, 2010, and August 2, 2010. During the August 1 interview, Sprague said that Kandi had left in the middle of the night with Peacock, the man she had met online. Sprague also said he felt that Kandi had changed over the last two months because his grandmother's spirit was in the house and was affecting Kandi's behavior. This interview lasted about 5 1/2 hours.

After investigators found Kandi's body, they interviewed Sprague again on August 2 for 2 1/2 hours. He was advised of his *Miranda* rights orally and in writing before the interview. Sprague maintained his story that Kandi had left him for another man until the investigators told him they had found her corpse. Sprague then confessed. Several times during the interview Sprague stated that he believed Kandi had a demon in her. When Sprague "got stuck" on that subject, investigators would "get him back on track."

Effenbeck testified she did not move to suppress Sprague's confession because she was under the mistaken belief that Sprague's prior counsel had already unsuccessfully argued such a motion. Hickman testified that he did not file a suppression motion because he wanted Sprague's statements admitted so Sprague did not have to testify at trial. Hickman did not believe that Sprague would do well on cross-examination. Hickman also testified that he was not aware the State's theme in arguing premeditation was the fact that Kandi was strangled. Had he known the importance of the strangulation part of Sprague's confession, he may have wanted the confession suppressed in retrospect.

We are persuaded by certain aspects to this case to move directly to an analysis of whether Sprague was prejudiced by his various attorneys' failure to seek suppression of his statements to the police. Sprague's statement to police that he strangled Kandi to death was the only evidence of strangulation at trial. The State relied heavily on strangulation to prove premeditation. The district court acknowledged the strangulation evidence was "if not the only evidence, certainly very strong evidence of premeditation and intent."

In addition, evidence of strangulation disproved Sprague's claim of self-defense. Even if he first hit Kandi in self-defense, he did not strangle her in self-defense. If there was a meritorious argument for suppression of Sprague's confession, trial counsel should have raised it. Without Sprague's confession, there could have been reasonable doubt whether this was premeditated murder or some lesser degree of homicide. And Sprague's theory of self-defense may have become plausible.

8

Our court has stated that when there is "at least some evidence" that an appellant's confession was involuntary, "it does not seem prudent to simply default to [trial counsel's] judgment that this was a valid trial strategy; actual consideration of the merits of [appellant's] claim is necessary." *Khalil-Alsalaami v. State*, 54 Kan. App. 2d 235, 250, 399 P.3d 264 (2017), *aff'd* 312 Kan. 62, 472 P.3d 60 (2020), *reh. granted* October 16, 2020. So we review for prejudice.

Kansas courts have long held that the State has the burden to prove the voluntariness of a confession by a preponderance of the evidence—that the statement was the product of the defendant's free and independent will. *State v. Mattox*, 305 Kan. 1015, 1042, 390 P.3d 514 (2017). The court looks at all of the circumstances surrounding the confession and determines its voluntariness by considering the following nonexclusive factors:

- the accused's mental condition;
- the manner and duration of the interrogation;
- the ability of the accused to communicate on request with the outside world;
- the accused's age, intellect, and background;
- the fairness of the officers in conducting the interrogation; and
- the accused's fluency with the English language.

*State v. Woods*, 301 Kan. 852, 867, 348 P.3d 583 (2015).

While the mental condition of a defendant is a "significant factor" in determining whether a confession is voluntary, a defendant's mental condition, by itself and apart from its relation to official coercion, is not the end of the inquiry into constitutional voluntariness. *State v. Lane*, 262 Kan. 373, 386, 940 P.2d 422 (1997). Mental illness is only one factor to be considered in that determination, and there must be a link between coercive activity of the State and the confession. 262 Kan. at 386.

Lane had an IQ of 77 and "was considered borderline mentally retarded." 262 Kan. at 386. But the court found his confession was not coerced because Lane had started the interview, the police did not trick or coerce Lane into confessing, the conversation was nonthreatening, Lane initiated communications with police previously on numerous occasions to mislead the police with alibis for the crime, and Lane was aware of what was occurring during the interview. 262 Kan. at 386.

Similarly, there was no coercion in *State v. Caenen*, 270 Kan. 776, 19 P.3d 142 (2001). Caenen was a paranoid schizophrenic with symptoms of delusions and hallucinations. During his interrogation, Caenen consistently told officers he was "mind-altered." 270 Kan. at 784. But on appeal, he pointed to no instances of police coercion. His speech was clear. Several times during the interview Caenen would begin to answer a question and then move into a story about his "mind-alteredness," but when the officer would direct him back to the current discussion, Caenen could follow. 270 Kan. at 785. He was given breaks. He was read his *Miranda* rights and said he understood them. He had a GED. He had several previous contacts with the police. He complained only of his mental illness as the deciding factor. The court found his confession was voluntary. 270 Kan. at 785-86.

Here, the district court found that Sprague did indeed express delusions that his home was haunted by a ghost, that Kandi had been possessed and controlled by demons, and that demons were present in lumber on his property that came from his grandfather's home in Abilene. But the court found that Sprague's responses to questions "were generally lucid and appropriate" and that he did not display any signs of hallucinations during the interviews. He would wander off topic but would be redirected by the officer and then would "lucidly and appropriately" discuss the case. The court found the interviews were "not unduly extended" and "not inappropriately confrontational"; Sprague was not denied communication with the outside world; Sprague was in his

10

thirties and of average intelligence; the officers were fair and tried to accommodate Sprague; and Sprague was fluent in the English language.

Those findings are supported by substantial competent evidence. As in *Lane*, Sprague had been in contact with the police the week before these interviews took place in which he had tried to mislead the police. He consistently maintained his story that Kandi had left him for another man until the officers told them they found her body. Sprague has showed no coercive behavior or unfairness by law enforcement. His belief in demons, by itself, was insufficient to establish that his confession was involuntary.

Sprague's trial counsel should have moved to suppress his confession because it was the only evidence of strangulation. His repeated references to demon possession in the police interviews put his mental condition in question. But the failure to file such a motion did not ultimately prejudice Sprague because his confession was constitutionally voluntary. He was not coerced into making a confession.

*Failure to investigate and present a mental disease or defect defense at trial*

Sprague argues Effenbeck was ineffective for failing to investigate and present a mental disease or defect defense at trial. He thinks she had a duty to consult another expert when Dr. Hough's report proved unhelpful because it focused on legal issues instead of Sprague's mental health. He relies on *Robinson v. State*, 56 Kan. App. 2d 211, 225-28, 428 P.3d 225 (2018), for support. In *Robinson,* this court upheld a finding of ineffective assistance of counsel in an arson case when trial counsel did not contact an expert until two weeks before trial, the expert proved to be unhelpful because the expert was unqualified to render an opinion on how the fire started, and trial counsel did not consider talking to another expert. 56 Kan. App. 2d at 225-30.

The statute in effect at the time of Kandi's death stated: "It is a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the mental state required as an element of the offense charged. Mental disease or defect is not otherwise a defense." K.S.A. 22-3220. Under this statute, mental disease or defect could negate the intent and possibly the premeditation required for first-degree murder. See *State v. McLinn*, 307 Kan. 307, 319-23, 409 P.3d 1 (2018).

Despite Sprague's delusion that Kandi was possessed by demons that were present in lumber that was from his grandfather's house in Abilene, Sprague's trial attorney did not present a mental disease or defect defense at trial. When Hickman and Sullivan represented Sprague, he was evaluated by a psychologist, Dr. Hough. At the K.S.A. 60-1507 hearing, there was a dispute about whether Dr. Hough's report was an adequate investigation into a possible mental disease or defect defense.

Hickman testified he presumed he and Sullivan must have discussed a mental disease or defect defense, but he had no specific recollection. Sullivan testified she was concerned about Sprague's delusions throughout her representation of him. She testified that Dr. Hough's report was inadequate because it "did not go into any depth about a diminished capacity defense. Specifically, whether or not his delusions, his mental disease or defect perhaps would negate the specific intent of a premeditated murder charge." She did not believe the report explored whether there was the possibility of a mental disease or defect defense. She testified it was "absolutely" necessary to consult another expert. If she had continued to represent Sprague, she would have hired another expert to evaluate him. According to Sullivan, it was "definitely necessary and in fact it would be negligent not to do so as an attorney to at least try to proceed in this in looking for an expert to . . . see whether or not it was . . . available as a defense." She did not deny that Dr. Hough was qualified to give such an opinion.

12

Effenbeck testified she did not feel that Sprague's belief that his house was haunted made him mentally ill or incompetent. He could discuss the case intelligently with her. Sprague's demon comments were a "very small portion" of what they would discuss.

In support of his K.S.A. 60-1507 motion, Sprague was evaluated by a psychologist, Dr. Marilyn Hutchinson. She testified that Sprague's behavior was dictated by his delusion that his wife was a demon. Sprague's delusion significantly impaired his ability to behave rationally; he was not responsible. Dr. Hutchinson testified that Dr. Hough's evaluation was incomplete.

The district court was unimpressed by Sullivan's testimony because she continued to represent Sprague for three months after receiving the report and did not consult another expert. The court found that Dr. Hough's report did make findings on point and the report concluded that mental disease or defect was not an available defense to Sprague. The court found it was reasonable for Effenbeck to rely on Dr. Hough's opinion without consulting another expert.

This case is not like the situation in *Robinson*, where the expert consulted was unqualified to render that opinion. Thus, our issue is whether the district court's factual finding—that Dr. Hough's report went into sufficient detail about a potential mental disease or defect defense—is supported by substantial competent evidence.

Dr. Hough concluded that Sprague was "criminally responsible" for the commission of the act of homicide. He stated, "While he may have believed Kandi was demon possessed, there is no evidence even from his own self-report that he was compelled to hit her, nor did he entertain beliefs that as a demon she must be killed." He noted that Sprague "never lost his sense of contact with reality, was not experiencing first rank indicators of psychosis such as auditory or visual hallucinations (or any command

13

elements to compel behavior), and was aware of the criminality of the act." Dr. Hough also noted that Sprague's behavior after the killing (concealing the crime and deflecting suspicion onto Peacock) "indicate capacity for elaborate and complex reasoning and planning."

The report does, at times, read like a legal analysis of Sprague's claim of self-defense, but it was titled "Psychological Report." Dr. Hough was a qualified psychologist, he understood he was assessing Sprague's "emotional state at the time of the offense," and he performed psychological testing.

The district court found Effenbeck could have reasonably read the report as foreclosing a mental disease or defect defense and that Effenbeck reasonably relied on such. There is substantial evidence to support the court's finding. *Robinson* does not support Sprague's assertion that Effenbeck needed to obtain another expert opinion when she had one from a qualified expert who gave an opinion on the matter; it just was not an opinion that helped Sprague.

*Failure to request a second competency examination*

Sprague contends Hickman and Effenbeck were ineffective in failing to request another competency hearing after the district court questioned Sprague's competency during Hickman's motion to withdraw as counsel. The court had noted that Sprague had a confused look on his face when it appointed Effenbeck to represent him. And Sprague talked about his belief that Kandi was possessed by a demon throughout Effenbeck's representation of him. He cites *State v. Davis*, 277 Kan. 309, 326-28, 85 P.3d 1164 (2004), for support.

This is a significant question. Under K.S.A. 22-3301(1), a defendant is incompetent to stand trial when the defendant cannot understand the nature or purpose of

14

the proceedings or cannot make or help make the defendant's defense because of mental illness or defect. The criminal trial of an incompetent person violates due process. *State v. Woods*, 301 Kan. 852, Syl. ¶¶ 1-2, 348 P.3d 583 (2015).

Sprague was charged with murder in August 2010. Later that month, his first attorney, Jason Tupman, moved to determine Sprague's competency to stand trial stating that "defendant appears unable to understand the nature and purpose of the proceedings against him or to assist in making of his defense to the charges herein." Sprague was evaluated by a psychotherapist at the Central Kansas Mental Health Center and found competent to stand trial:

> "Mr. Sprague correctly described the charges against him. He demonstrated a good understanding of the nature, object and participants of criminal trial proceedings. For example: when asked to define the role of a jury he stated, 'To take all evidence laid before them and make a sound decision based on that evidence as to whether or not to convict the defendant on the charges.'
>
> "He has an awareness of his basic legal rights and options. He expressed a realistic understanding of possible consequences of being found guilty. He expressed appropriate concern for his legal situation and reported that he would act in his own best interest.
>
> "He is fully capable of assisting his attorney in his defense."

 Based on that report, the court found Sprague competent to stand trial.

In May 2011, at a hearing on Hickman and Sullivan's motion to withdraw as counsel, the court asked counsel whether Sprague had undergone a competency evaluation. It appears the court was just asking in investigating his alleged conflict of interest with his attorneys. There is nothing in the transcript of that hearing to indicate Sprague was not competent to stand trial.

15

Later that month, before Effenbeck was appointed to represent Sprague, Sprague appeared at a continuance hearing. The court appointed Effenbeck and made a comment about Sprague looking confused. Sprague explained that he wanted to hire private counsel but did not have the funds because his house was tied up in litigation. There is nothing in the transcript of that hearing to indicate Sprague was not competent to stand trial.

At a hearing on Sprague's decision whether to testify, he stated, "I don't know if I'm capable of making that decision because emotionally I want to, but I got to trust Miss Effenbeck whatever she says is best for me to do." Sprague was torn between his emotions and his attorney's advice, but he understood the concept of waiving his right to testify and he asked an intelligent question about what would happen if a mistrial occurs. Ultimately, he agreed he was waiving his right to testify based on advice from counsel.

We do not think that *Davis* is helpful. The facts are unlike this case. Davis suffered from schizophrenia and had been committed to psychiatric hospitals on 31 occasions. The court stated:

"It is clear in this case that Adams should have sought another competency hearing prior to trial. The defendant had an extensive history of mental illness and frequent commitments. Between October 1999 and April 2000, he vacillated between competency and incompetency to stand trial. Upon his first evaluation in October 1999, Dr. Logan opined that it was unlikely that the defendant could remain competent throughout the stress of a trial.

"Only 2 weeks later, the defendant was found incompetent to stand trial, and he was only found competent after a highly structured stay at Larned 6 months before trial. He was then returned to the Sedgwick County Jail, where he was noncompliant with his medication and reported an increase in hallucinations a few months before trial. The defendant's letters to Adams prior to trial were at times incoherent and demonstrated confusion regarding his defense. Adams testified that if he had known the defendant was not taking his medication, he would have moved for another competency hearing.

16

Counsel made no inquiry at the jail to determine whether the defendant was compliant with medication orders and no inquiry of health care professionals.

"Adams admitted that he should have sought another competency hearing prior to trial." 277 Kan. at 323.

There is no similar psychiatric medical history in this record. Sprague was never found incompetent to stand trial. And Sprague's attorneys did not believe another competency hearing was necessary.

At the K.S.A. 60-1507 hearing, neither Hickman nor Effenbeck believed Sprague was incompetent to stand trial. Effenbeck testified that throughout her representation of Sprague he stated he believed Kandi had been possessed by a demon, but he was "always lucid and always intelligently discussed his case." She testified, "He didn't sit there and talk about demons the entire time. . . . He mentioned them but that was not his entire focus. He didn't dwell on that."

Sprague's attorneys were not ineffective for failing to seek a second competency evaluation.

**Alleged trial errors**

Sprague raises nine trial errors that we have formed into three groups. First, we review his four arguments about counsel's failure to offer certain evidence. After that, we examine his four claims about trial counsel's failure to object at various times. And finally, we look at his claim that counsel failed to impeach a witness.

*Failure to offer certain evidence*

1. Failing to call Dr. May to testify

17

Sprague contends that Effenbeck was ineffective for failing to call Dr. May to testify at trial because Dr. May would have testified that there was no evidence of a second blow to Kandi's head; there was no hemorrhage on the second fracture which suggested the second fracture was potentially postmortem. Sprague argues this would have corroborated his statement to law enforcement officers that he only hit Kandi once in self-defense. Sprague also argues it could have shown that Kandi was already dead when he strangled her.

Dr. May is the forensic pathologist hired by Sprague's public defenders to evaluate Dr. Mitchell's autopsy and cause of Kandi's death. Effenbeck consulted with Dr. May and made some handwritten notes from two phone calls, which were admitted at the K.S.A. 60-1507 hearing. Effenbeck had intended to call Dr. May to testify up until the "last minute" but changed her mind. On the last day of trial, she informed the court that she spoke with Dr. May "for some []time" the night before and decided not to call her as a witness. Dr. May did not testify at Sprague's trial. Effenbeck recalled that Dr. May's testimony could have hurt Sprague because she would have testified the initial injury was survivable.

We agree with the district court on this point. Effenbeck made the strategic decision not to call Dr. May as a witness after discussing the case with her the night before. The district court correctly held that Sprague did not meet his burden to show ineffective assistance of counsel.

### 2. Failure to call a corroborating witness

Sprague contends Effenbeck was ineffective for failing to introduce Deputy William Hill's report because Sprague's statement to Hill would have bolstered his self-defense claim. The State contends it was a "risky proposition" to introduce evidence that

18

not only amounted to another confession by Sprague, but one that was different from what Sprague told police on August 2.

While in jail, Sprague told Deputy Hill that he had been in the shed working when his wife came out and "began to nag" him. She was larger than him. "My wife then grabbed a hold of my arm and began pulling on it. She then grabbed a hold of my neck and started choking me." The officer wrote:

> "He then informed us that he reached for the first thing he could find which was a wrench. He informed us that he swung the wrench at his wife and hit her on the head. Next thing he knew she fell to the ground. She was lying there, and blood came out in her head and mouth."

Frankly, Sprague fails to show how Deputy Hill's testimony would have benefited the defense. Sprague talked to Deputy Hill in the jail the day after Sprague had at first confessed to police. He said his wife had been nagging him. It was another confession to killing his wife. This does not persuade us that his counsel was ineffective.

### 3.    Failure to present statements from Sprague's daughters

Sprague contends that Effenbeck was ineffective for not calling his seven-year-old daughter (his oldest daughter) to testify because she said that Kandi was abusive towards Sprague and the girls. She would say that Sprague was never abusive toward Kandi, and he took good care of the girls. Sprague contends that although his four-year-old daughter had said that he had hit Kandi, many of her statements were "incredible" or resulted from leading questions and she would not likely have been competent to testify at trial. Sprague contends that his oldest daughter's testimony was critical evidence to support his defense of self-defense. He cites *Shumway v. State*, 48 Kan. App. 2d 490, 293 P.3d 772 (2013).

19

The record shows that two of Sprague's three young daughters were interviewed by a social worker. These interviews were recorded. The girls did not witness the homicide. Effenbeck did not call the girls to testify at trial or otherwise present their statements. A DVD of the interviews was admitted as evidence at the K.S.A. 60-1507 hearing. At the hearing, Effenbeck acknowledged that Sprague wanted his daughters to testify. She recalled that she did not call the girls to testify because although they said Kandi would hit Sprague, they had also stated that Sprague would hit and yell at Kandi. She also believed having the girls testify would reflect poorly on Sprague.

Strategic decisions made by trial counsel based on a thorough investigation of the law and facts are virtually unchallengeable. Trial counsel has the responsibility for determining which witnesses will testify. Even though experienced attorneys might disagree on the best strategy, deliberate decisions based on strategy may not establish ineffective assistance of counsel. Yet defense counsel may not disregard pursuing a line of investigation and call it trial strategy. Strategic choices based on an incomplete investigation are reasonable if reasonable professional judgment supports the limitation on the investigation. *Shumway*, 48 Kan. App. 2d at 497-98.

In *Shumway*, Shumway was convicted of intentional second-degree murder based on the testimony from eyewitnesses with credibility problems. There was no physical evidence tying Shumway to the crime. After an evidentiary hearing on Shumway's K.S.A. 60-1507 motion, the district court denied the motion. But this court reversed, finding defense counsels' failure to call several witnesses constituted ineffective assistance of counsel. 48 Kan. App. 2d at 513-14. There were two alibi witnesses who could have testified that Shumway was at home on the night of the murder. At the K.S.A. 60-1507 hearing, Shumway's trial attorneys testified that they did investigate the alibi witnesses and they gave several reasons for not calling the witnesses to testify. The panel was not swayed by the attorneys' reasons because there were no other witnesses who could have established Shumway's innocence, and there was another disinterested witness

20

who could have corroborated the testimony. Because there was no equivalent evidence to counter the State's witnesses, trial counsel was ineffective for failing to call the alibi witnesses. 48 Kan. App. 2d at 496-502.

Those facts are far different than what is shown in this record. Sprague's daughters did not have any direct evidence of what happened the night their mom died. In *Shumway*, the witnesses could have established Shumway was not there when the victim was killed. And Sprague's self-defense strategy evaporated when he admitted he strangled Kandi after she was on the floor incapacitated. Sprague was not prejudiced by counsel not calling the girls to testify.

It was doubtful the girls' testimony would have helped Sprague on this point at all. Effenbeck made a strategic decision not to call Sprague's daughters to testify after investigating. Even Sprague's oldest daughter was very young and repeatedly denied that either parent would hit the other.

> 4.      Failing to use a text message from Kandi

Sprague contends that Effenbeck had a duty to use the evidence of a text message sent by Kandi in support of his theory of defense during closing arguments. During trial, the State admitted various phone contacts between Kandi and Peacock into evidence. One of Kandi's text messages to Peacock said, "It's okay not your fault but you want to remind me why I don't want to hurt my kid's dad, gurr."

Kandi's phone records also showed she received a call at 12 a.m. just before her death. The text message and phone call tended to corroborate Sprague's statement to police that Kandi received a phone call from Peacock right before she attacked him in the Morton building. Effenbeck did not specifically mention that text message or phone call in her closing argument. She did mention in general the cell phone conversations between

21

Kandi and Peacock to argue they had an intimate relationship, and that Kandi was more focused on her online life than her family. She did argue that

- "something" made Kandi mad that night;
- Kandi probably got upset after Sprague informed Peacock that Kandi was married;
- Kandi was upset enough to confront Sprague in his shop; and
- Sprague defended himself.

At the K.S.A. 60-1507 hearing, Effenbeck did not explain why she failed to specifically use the text message and phone call to support this argument.

This is one of those trial errors that surfaces years later while reading a trial transcript. And years later, there is no memory of why something was not mentioned in argument. But given that the text message was introduced by the State, it is also difficult to say that Sprague was prejudiced by any error here. The jury was shown the text message. It is hard to quantify how much it would have helped Sprague for Effenbeck to press the point. And Sprague's statement to police betrayed any defense of self-defense. He admitted that after he had hit Kandi and she was helpless on the floor but not dead, he strangled her with a rope. We are not persuaded that this is reversible error.

*Failure to object*

1. Strangulation evidence

Sprague contends Effenbeck was ineffective for failing to object to Dr. Mitchell's opinion about strangulation because the evidence of strangulation came from Sprague's statements, not the physical evidence. He cites *State v. Bressman*, 236 Kan. 296, 689 P.2d 901 (1984).

22

Dr. Mitchell testified Kandi's cause of death was the head injury. When asked whether Kandi could have died from strangulation as Sprague had told police, Dr. Mitchell stated, "Well, taking that description at face value . . . you'd have the supervening factor of strangulation but it is something that I am unable to anatomically diagnose." The doctor was clear when he testified,

> "I have no way of demonstrating the presence or absence of strangulation anatomically here that is something that comes purely from investigative information.
>
> . . . .
>
> "[T]he fact is the only evidence we have anatomically is the head injury.
>
> . . . .
>
> "I cannot confirm or refute the Defendant's statement."

Effenbeck did not object at trial.

An expert may testify to the cause of the death when within the scope of his or her expertise. See *State v. Torres*, 280 Kan. 309, 334, 121 P.3d 429 (2005); *State v. Shaw*, 260 Kan. 396, 399, 921 P.2d 779 (1996). But expert testimony must help the jury in interpreting technical facts. When the normal experiences and qualifications of lay jurors would permit them to draw proper conclusions from the given facts, expert opinions are inadmissible. An expert's opinion is admissible up to the point where an expression of opinion would require the expert to pass upon the credibility of witnesses or the weight of disputed evidence. An expert witness may not pass on the weight or credibility of evidence. *State v. Smallwood*, 264 Kan. 69, 80, 955 P.2d 1209 (1998).

In our view, the district court correctly found:

> "Contrary to the assertion in Sprague's framing of this issue, Dr. Mitchell did not make a 'finding' based on Sprague's statement. He simply testified that, if you took that statement at face value, 'it would mean you'd have [the] supervening factor of

23

strangulation but it is something that I am unable to anatomically diagnose.' Dr. Mitchell did not testify to a finding made by him that strangulation had occurred. While he did admit that he relied upon police investigative information, including Sprague's admission concerning what happened, his testimony nonetheless cannot be construed as his opinion or 'finding' that strangulation occurred. The only professional opinion he rendered regarding strangulation was that *if* it had occurred, it would have been [a] supervening cause of Kandi's death. In fact his testimony was clear that he could make no independent finding of strangulation.

"His testimony is not objectionable, and Effenbeck's failure to object to it therefore does not constitute ineffective assistance of counsel."

In *Bressman*, the case Sprague cites, the doctor found no physical evidence of sexual intercourse but testified at trial that she believed the victim had been raped based in large part on her story. Our Supreme Court held this was error because the doctor was not trained in psychiatry and her opinion was essentially based on the story related to her by the victim rather than her physical examination, which was negative in result. The court held it was within the province of the jury to pass on the credibility of the victim's story. 236 Kan. at 302-04.

Here, in contrast, Dr. Mitchell never gave an opinion whether Kandi had been strangled. The doctor testified repeatedly there was no physical evidence of strangulation and, based on the physical evidence, he could not confirm or refute Sprague's statement to police. His testimony was unobjectionable.

2.      Failing to object to prior bad acts evidence

Sprague contends Effenbeck was ineffective for failing to object to bad acts or hearsay testimony from Peacock, Helm, and Joshua Clevenger under K.S.A. 60-455. Peacock testified that after he had talked to Sprague on July 23, 2010, Kandi told him she

24

planned to talk to a lawyer about getting a divorce. Peacock also testified that Kandi told him Sprague "tried to get her to take a handful of pills" the day before her death.

Helm testified that Kandi told her she feared for her daughters and herself because Sprague was abusive, controlling, mean to the girls, and on July 23, 2010, he had tried to get her to take pills.

Clevenger, a computer forensic examiner, testified that on July 23, 2010, Kandi sent a message by Skype to a person named Jackson stating, "Well my husband and I have been talking about this Steve crap for days now."

For its part, the district court considered this evidence. The court found Effenbeck's failure to object to this testimony was outside the wide range of reasonable professional assistance. But the court found the evidence relevant to prove intent, motive, and plan. And given the nature of the evidence, the facts surrounding Kandi's death, the proximity of the pill incident to her death, and the issues presented by the defense, the probative value of the evidence outweighed its prejudicial effect. The court also found the jury's verdict would not have been different if the court had given an appropriate limiting instruction on this evidence.

The district court found that Peacock's testimony concerning divorce was marital discord evidence admissible under *State v. Drach*, 268 Kan. 636, 1 P.3d 864 (2000). The court also found that Helm's testimony constituted marital discord evidence admissible under *Drach* independent of hearsay concerns. The district court also found Clevenger's testimony to be admissible as marital discord evidence.

Under K.S.A. 2011 Supp. 60-455(a), "evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed

25

another crime or civil wrong on another specified occasion." Such evidence "is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." K.S.A. 2011 Supp. 60-455(b).

In reviewing the admission of prior crimes evidence under K.S.A. 60-455, courts use a three-step test:

- First, the court considers whether the evidence is relevant to establish a material fact at issue.
- Second, the court must determine whether the material fact is disputed and whether the material fact is relevant to prove the disputed fact.
- Finally, the court must consider whether the probative value of the evidence outweighs its prejudicial effect.

*State v. Haygood*, 308 Kan. 1387, 1392-93, 430 P.3d 11 (2018).

If prior crimes evidence is admitted under K.S.A. 60-455 in a jury trial, a limiting instruction must be provided to inform the jury of the specific purpose for which the evidence was admitted. *Haygood*, 308 Kan. at 1393.

We hold that the district court did not err in determining that Peacock's and Helm's testimony about the pill incident could have survived the K.S.A. 60-455 particularized weighing of probative value versus prejudicial effect. This evidence was prejudicial to Sprague. But it was particularly probative of intent and motive because the pill incident occurred either the day of or the day before Kandi's death. See *State v. Vasquez*, 287 Kan. 40, 52, 194 P.3d 563 (2008). The pill incident testimony was also central to the issue of whether Sprague was telling the truth that he acted in self-defense.

The district court also did not err in determining that the outcome would not have been different if the court had given a limiting instruction. The jury was unlikely to

consider the testimony of the pill incident as evidence of Sprague's propensity to commit the murder. The events were dissimilar.

3. Failure to object to questions about Sprague's failure to answer some police questions

Sprague contends the prosecutor, during the examination of two police officers, improperly used Sprague's postarrest, post-*Miranda* silence as evidence of his guilt and Effenbeck was ineffective for failing to object.

Sprague was advised of his *Miranda* rights on August 1, 2010. On August 2, Deputy Kalen Robinson arrested Sprague and drove him to the jail. During trial, the prosecutor asked Deputy Robinson about his conversation with Sprague during the drive:

"Did he ever ask you, 'Why am I being arrested?'
. . . .
"Did he ever ask you, 'Have you heard anything about my wife?'
. . . .
"Did he share with you his wife was missing?"

The prosecutor asked Deputy Rick Heinrich the following:

"Did he ever ask you if Kandi had been located?
. . . .
"Did he ever ask you why he was being arrested?
. . . .
"Did he ask you anything at all about Kandi Sprague?"

Effenbeck did not object.

27

The State cannot use a defendant's post-*Miranda* invocation of his or her right to silence against a defendant. *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). A *Doyle* violation during the prosecutor's questioning of a witness cannot be raised on direct appeal absent a contemporaneous objection. See *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009).

But even if we view these questions and answers to be erroneous, we are not convinced that they were prejudicial. The testimony was inconsequential because Sprague ultimately confessed. The jury did not need to infer his guilt from his silence right after his arrest. The prosecutor did not use the referenced testimony against Sprague during closing arguments. The prosecutor used Sprague's silence for more than a week after Kandi's death against him. During closing arguments, the prosecutor argued that if Sprague had hit Kandi in self-defense, he would have immediately reported that to someone. We cannot conclude counsel was ineffective for failing to object.

4.      Failure to object to some photographs

For his last complaint about his trial attorney's failure to object, Sprague turns to the question of the admission of some photographs. But he did not make a specific argument to the district court on this point and essentially tries to raise it for the first time on appeal.

Hickman moved in limine to exclude the photographs of Kandi's excavation and autopsy from trial. At that time, the prosecutor did not know which photographs she would use. The district court therefore delayed ruling on the issue until trial or a pretrial conference. Effenbeck did not object to the photographs at trial.

Sprague failed to argue before the district court why any specific excavation or autopsy photograph should have been excluded. He just referred to them collectively and said they were "gruesome." The district court ruled he just labeled them as offensive:

"Sprague has failed to demonstrate the irrelevance of the photographs introduced, or that their probative value was substantially outweighed by their prejudicial effect. In fact, in his memorandum, he has not argued either of these points, but has apparently invited the court to conclude that mere failure to object to some or all of these photos—which he does not specify—is evidence either that trial counsel's performance was ineffective, or that introduction of the photos unduly prejudiced Sprague. This the court may not do."

Sprague now attempts to argue for the first time on appeal why specific photos should have been excluded. Because he made no specific argument to the district court on this issue, we will not review it on appeal.

*Failure to impeach*

For his last trial error, Sprague contends that Effenbeck was ineffective for failing to move to strike Helm's statement that she "believe[d] everything [Kandi] told me" because a witness may not express an opinion on the credibility of another witness. This stems from the testimony from Effenbeck's cross-examination of Helm. She began with questions concerning how her and Kandi's conversations were conducted:

"Q.      And do you know how many hours a day roughly you would spend communicating with Kandi on the computer and the phone?
"A.      It varied from day to day, it could be anywhere from an hour to two, to maybe three to four, maybe possibly six, depending on the day because we would get bored.
"Q.      Okay, okay, and were you aware that Kandi had small children in the home?
"A.      Yes.
"Q.      Okay and do you know what the small children were doing when she was on the laptop or the computer all that time?

29

"A.     She would talk to them and talk—and go back and forth between them and the computer."

Effenbeck then inquired how Helm was so sure:

"Q.     Okay, but you weren't there, you don't really know?

"A.     But I would hear it on the phone.

"Q.     Okay, but when she was typing, I mean, she could be typing anything to you and you would not know whether or not it was true, is that correct?

"A.     It would—yeah, I guess so.

"Q.     Okay, because actually you never personally met Kandi?

"A.     But talking to her through the phone she—I believe everything she had told me."

Sprague also argues that Effenbeck was ineffective for failing to impeach Kandi's credibility for telling her mother and Peacock that she was planning to have a hysterectomy.

We recognize the well-known rule that a witness may not express an opinion on the credibility of another witness. *State v. Elnicki*, 279 Kan. 47, 53, 105 P.3d 1222 (2005). But Kandi was the victim and did not testify. And we understand that a defense attorney may be ineffective for failing to impeach a complaining witness. *State v. Brooks*, 297 Kan. 945, 952, 305 P.3d 634 (2013). But Helm was not a complaining witness.

Effenbeck testified she did not object to Helm's statement because she thought it made Helm look foolish for trusting everything a stranger on the internet told her. This was trial strategy. We defer to trial strategy.

Besides, Kandi's credibility was already impeached by the testimony that she told her internet friends she was divorced. It was clear she was not completely honest when talking to her internet friends. Whether Kandi had a hysterectomy scheduled was inconsequential. And Kandi's credibility was only marginally relevant. Her text messages

30

and phone conversations could not tell the jury what happened between her and Sprague in the Morton building on the night of her death. It was mainly Sprague's credibility that the jury had to determine—not Kandi's.

To sum up, we have carefully reviewed the nine claims of trial errors raised by Sprague. We are not persuaded that individually or collectively that they show his trial attorneys were ineffective to the point that he is entitled to habeas corpus relief. We move now to the question about Sprague being called to testify.

**Sprague did not testify**

Sprague contends that Effenbeck waived Sprague's right to testify. Sprague claims that he did not waive this right. One of the few trial decisions that is reserved solely to a criminal defendant is whether to testify. A criminal defendant has a constitutional right to testify at trial and only the defendant can waive that right. *State v. Brown*, 305 Kan. 413, 425-27, 382 P.3d 852 (2016). But the record leads us to a different conclusion.

On the last day of trial after the State had rested, there was a discussion between Sprague, Effenbeck, the prosecutor, and the judge concerning whether Sprague would testify. Effenbeck began by noting that she went to the jail the night before and talked to Sprague about whether he would testify. She then stated that they had decided he would not testify and asked Sprague if that was correct. He said, "Correct." He also agreed that he understood he had the right to testify.

The judge instructed Sprague that it was his decision whether to testify. When the judge asked him if he understood that his decision not to testify would be "a final decision" and he could not change his mind later, Sprague made "[n]o audible response." The judge and Effenbeck continued to talk to him, with no audible response. The prosecutor also jumped in repeatedly and talked to Sprague about his right to testify.

31

Finally, Sprague said he was "a little lost" and asked, "So I could never testify no matter what the rest of my life?" He asked if he could testify later if there was a mistrial. The judge, Effenbeck, and the prosecutor all gave several responses before Sprague said, "this is all too hard for me." He continued,

> "I don't know if I'm capable of making that decision because emotionally I want to, but I got to trust Miss Effenbeck whatever she says is best for me to do, so, I don't like to try to make a decision like that because emotionally I want to but I don't feel qualified to make that decision. I think it's up to [Effenbeck]."

Effenbeck stated, "[H]ow you are today probably wouldn't be good to put you on the stand right now." She noted he was on suicide watch the night before, which had put him in a bad mood. The prosecutor then suggested that they take a break so Sprague could have more time to talk to Effenbeck. The court agreed. Effenbeck apparently did not agree. Sprague then said, "Well, I don't want to have to make the decision, can't [Effenbeck] . . . ." Rather than take a break to talk to her client as suggested, Effenbeck asked Sprague, "Are you trusting me to make that decision?" Sprague responded, "Yeah, yep, yep."

The prosecutor noted that Sprague had "to tell the court that it's your decision not to testify." Effenbeck said that she and Sprague had discussed that it would not be in his best interests to testify. Sprague agreed. The prosecutor asked if anyone was forcing him not to testify. Sprague said, "Nope, nobody is forcing me to do anything." The court then asked Sprague if it was his decision not to testify, based on advice from his counsel. Sprague responded, "Yes." Jumping in again, the prosecutor asked, "And that's your voluntary choice?" To which Sprague responded, "Yes."

We hold that the district court got it right when it found:

"While he expressed confusion about what it meant when he was told he would not be able to testify later, it is clear that this was explained to him to his satisfaction. In fact he asked a rather perceptive and appropriate question concerning what would happen if the jury could not reach a verdict. That question was answered. In addition, when he asked whether Effenbeck could make the choice for him, and she inquired whether he was trusting her to ma[k]e the decision, he was then informed that only he could make the decision, based on advice of his counsel, and he made it.

"The court finds that Effenbeck did not 'waive' or usurp Sprague's constitutional right to testify, and that it was entirely his choice, with her advice, not to do so."

There is substantial evidence to support the court's finding that Sprague did ultimately waive his own right to testify.

**Combined errors of trial and appellate counsel**

We have grouped three of Sprague's claims here. First, we examine his contentions about trial counsel failing to object to the prosecutor's closing argument and his appellate counsel's failure to raise the issue on appeal. Next, we review his argument that both were ineffective for failing to employ a "stand your ground" instruction. Finally, we deal with Sprague's argument that his lawyers were ineffective because they failed to object to a general intent instruction given by the trial court.

1.     Prosecutor's closing argument

Sprague contends the prosecutor misstated the law in closing arguments. He contends his trial counsel was ineffective for failing to object, and his appellate counsel was ineffective for failing to raise this issue on direct appeal.

Sprague focuses on the prosecutor's statement that "[p]remeditation doesn't . . . mean that an act is planned, contrived or schemed beforehand" was erroneous because it

33

implied that premeditation can be instantaneous. For support, he cites *State v. Hall*, 292 Kan. 841, 852, 257 P.3d 272 (2011). He also argues that it was prosecutorial error to state, "The Defendant's motivation in killing Kandi Sprague is irrelevant, whether it was because he was scared, jealous, scared he was going to face a divorce." In Sprague's view, his emotions and motives were relevant to his claim of self-defense and relevant to the lesser included offenses of second-degree murder and voluntary manslaughter. For this, he relies on *State v. Hill*, 242 Kan. 68, 74, 744 P.2d 1228 (1987).

Both counsel were candid with the court on this point. Effenbeck agreed that she should have objected to the "scared" statement and she had no strategic reason for not doing so. Cessna agreed both statements were misstatements of the law and she did not remember why she did not raise them on direct appeal.

But we are not compelled to grant relief on this point.

Kansas courts recognize the importance of closing arguments. Appellate courts will review a prosecutorial error claim based on a prosecutor's comments made during closing argument even without a timely objection. *Butler*, 307 Kan. at 864. A deliberate misstatement of controlling law is outside the considerable latitude given to prosecutors during their arguments. *State v. Gunby*, 282 Kan. 39, 63, 144 P.3d 647 (2006).

Some legal concepts are difficult to define. Although there is no specific time period required for premeditation, premeditation requires more than an instantaneous intentional act of taking a life. *Hall*, 292 Kan. at 850. "Premeditation . . . does not have to be present before a fight, quarrel, or struggle begins. Death by manual strangulation can be strong evidence of premeditation." *Gunby*, 282 Kan. 39, Syl. ¶ 9.

*Gunby* is instructive. The court looked at the facts in *State v. Scott*, 271 Kan. 103, 21 P.3d 516 (2001), to resolve this issue:

"The victim in *Scott* had been strangled, 'most likely manually,' and there was blunt force trauma to her head. The strangulation had been prolonged and followed an argument and struggle.

"On appeal, the defendant challenged the sufficiency of the evidence to support the jury's finding of premeditation. We held that his 'continued application of pressure over a period of time [was] sufficient for a jury to find that [the victim's] death was premeditated.' Further, 'premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct,' but premeditation 'does not have to be present *before* a fight, quarrel, or struggle begins. Premeditation is the time of reflection or deliberation. Premeditation does not necessarily mean that an act is planned, contrived, or schemed beforehand. . . . Indeed, death by strangulation can be strong evidence of premeditation.' [Citations omitted.]" 282 Kan. at 64.

The *Gunby* court followed with a reference to another set of facts:

"Our recent decision in *State v. Jones,* 279 Kan. 395, 109 P.3d 1158 (2005), also involved a situation somewhat similar to this case. The victim had been manually strangled, and we reaffirmed *Scott*'s holding that a jury can find a defendant's state of mind changed from mere intent to premeditation at any time during the violent episode that ultimately causes the victim's death, including at any time during a strangulation. [Citation omitted.]" 282 Kan. at 65.

*Gunby* teaches us to look at the facts in order to determine premeditation. And we review the prosecutor's comments in the light of the facts here.

Context is important here. As for premeditation, the prosecutor said to look at all of the facts, not just a possible plan:

"Premeditation, as you've been told in the instructions, means essentially to have thought the matter over beforehand, it doesn't require a specific timeframe. In other words, the Defendant only had to have formed the design or intent to kill before he killed Kandi

35

Sprague. There is a process of thinking about the killing before engaging in the homicidal conduct, it's about the Defendant's state of mind before he killed Kandi Sprague."

She then moved on to refer to Sprague's statements:

"Premeditation can be inferred from the evidence in this case and you are going to— you've heard some evidence from the Defendant's statement to Special Agent Schneider and Inv. Sweeney that there was some struggle, well; premeditation doesn't even have to be present before a fight, quarrel or a struggle be[gins]. It can be developed during the course of that fight[,] quarrel or struggle if you believe the Defendant's statements that Kandi Sprague had struggled with him or it can be developed premeditation can be developed after it's over, after the quarrel is over. *Premeditation doesn't necessarily mean that an act is planned, contrived or schemed beforehand* and one of the factors you can look at from all of the evidence and inferring if premeditation is present is the nature of the weapon used. . . . The State submits that we have a lot of evidence of premeditation. Death by strangulation takes minutes, ladies and gentlemen, Dr. Mitchell was very clear about that, it takes minutes to strangle a person to death. The Defendant had minutes to think about what he was doing, to deliberate, to reflect on his actions, he could have stopped anytime within those minutes that it required—minutes that were required to kill Kandi Sprague. . . . That, ladies and gentlemen, is a[n] extremely strong factor in support of premeditation." (Emphasis added.)

In context, "beforehand" in the prosecutor's statement referred to "before the fight," not "before the act of killing." The prosecutor was arguing that Sprague did not need to form the premeditation to kill Kandi before they fought—he could have formed the premeditation to kill her during the several minutes it took him to strangle her to death. The prosecutor was basing this discussion on Sprague's version of events in which Kandi attacked him, he hit her, she fell to the ground, but she was still alive, and then he decided to strangle her. As discussed above, the State's primary argument for premeditation was the strangulation. Under these facts, the prosecutor's statement was not a clear misstatement of the law. This argument closely tracked the discussion in *Gunby*.

36

The district court aptly distinguished *Hall*:

> "The obvious difference between the facts in *Hall* and the facts in Sprague's case is that the four gun shots in *Hall* were noted by the court to be in rapid succession, immediately killing McMaster, an almost instantaneous process, while here, Kandi was struck on the head incapacitating her, but her death was caused by strangulation similar to that which occurred in *Gunby*, a much slower process."

And the jury was correctly instructed:

> "Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life."

Effenbeck was not ineffective for failing to object to the prosecutor's statements on premeditation. Nor was Cessna ineffective for failing to raise the point on appeal.

As for Sprague's second argument of prosecutorial error, his citation to *Hill* is unpersuasive because that court was discussing the meaning of "heat of passion," one form of voluntary manslaughter. 242 Kan. at 74. Heat of passion was not included in the voluntary manslaughter instruction given in Sprague's case.

The prosecutor said,

> "The State submits that you don't even need to get that far because Second Degree Murder is an intentional killing without thinking about it beforehand. Voluntary manslaughter would be a killing upon a sudden quarrel or a reasonable belief that the person had to defend himself, it doesn't fit here. There is nothing to support those crimes. Therefore, I submit the Defendant shouldn't be found guilty of those crimes, he should be found guilty of what he's actually guilty of and that's Premeditated First Degree Murder.

37

The Defendant's *motivation in killing Kandi Sprague is irrelevant, whether it was because he was scared, jealous, scared he was going to face a divorce*, that doesn't matter why he chose to strike her with that pipe and strangle[] her to death, *he* [*is*] *still just as guilty of Premeditated First Degree Murder whether it was because he was scared or jealous or any emotion that he may have been feeling at that point in time*." (Emphases added.)

In context, it appears the prosecutor was saying that motive and emotion were irrelevant to determining whether Sprague was guilty of premeditated first-degree murder. The jurors would not get to the lesser included offenses if they found Sprague guilty of premeditated murder.

Motive is not an element of premeditated first-degree murder. The prosecutor was correct when she stated that the State did not need to prove what Sprague's motive was. Under K.S.A. 2010 Supp. 21-3211, a person is justified in the use of deadly force when and to the extent that it appeared to such person and such person reasonably believed that such use of force was necessary to prevent imminent death or great bodily harm to such person. And Sprague's jury was so instructed.

Sprague's fear of Kandi would have been relevant to self-defense. But this error was ultimately not prejudicial because the evidence showed that Kandi was not killed from the blows to her head, but that Sprague strangled her to death after she was incapacitated and was no threat to him. Self-defense was an unlikely outcome given Sprague's statement to the police that he strangled her after she was on the ground. Couple those statements with Dr. Mitchell's testimony that the blows to Kandi's head were probably survivable, and the jury was given the correct instruction on self-defense.

Again, there are no grounds for relief here.

      2.     No "stand your ground" instruction

Sprague contends Effenbeck was ineffective for failing to ask for a use of force presumption based on K.S.A. 2010 Supp. 21-3212a and Cessna was ineffective for failing to raise the issue on appeal.

The statute, K.S.A. 2010 Supp. 21-3212a, creates a presumption:

"(a) . . . [A] person is presumed to have a reasonable belief that deadly force is necessary to prevent imminent death or great bodily harm to such person or another person if:

(1) The person against whom the force is used, at the time the force is used:

(A) Is unlawfully or forcefully entering, or has unlawfully or forcefully entered, and is present within, the dwelling, place of work or occupied vehicle of the person using force; or

(B) has removed or is attempting to remove another person against such other person's will from the dwelling, place of work or occupied vehicle of the person using force; and

(2) the person using force knows or has reason to believe that any of the conditions set forth in paragraph (1) is occurring or has occurred.

"(b) The presumption set forth in subsection (a) does not apply if, at the time the force is used:

(1) The person against whom the force is used has a right to be in, or is a lawful resident of, the dwelling, place of work or occupied vehicle of the person using force, and is not subject to any order listed in K.S.A. 21-3843, and amendments thereto, that would prohibit such person's presence in the property."

The jury instruction explains this presumption to the jury. The bracketed portion in PIK Crim. 3d 54.17 (2010 Supp.) is to be used as an optional instruction when the facts warrant it:

"You must presume that a person had a reasonable belief that use of physical force likely to cause death or great bodily harm was necessary to prevent imminent death or great bodily harm to (himself) (herself) (someone else) if you find the following:

39

"1. at the time the force likely to cause death or great bodily harm was used, the individual against whom the force was used (insert one of the choices from below) (was unlawfully or forcefully entering) (had unlawfully or forcefully entered) and was presently within the (dwelling) (place of work) (occupied vehicle) of the person using the force."

But a jury instruction must be legally and factually appropriate. *McLinn*, 307 Kan. at 318. As for the factually appropriate inquiry, courts should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction. *State v. Williams*, 303 Kan. 585, 598-99, 363 P.3d 1101 (2016).

The district court found that Kandi was a lawful resident on the Sprague property living there as Sprague's wife, she was lawfully present in the Morton building at the time of her death, and there was no evidence she forcefully entered the Morton building.

The district court's findings are supported by substantial competent evidence. The use of force presumption was not factually appropriate in this case.

This claim does not entitle Sprague to any relief.

3.      A general intent instruction was given

Sprague contends Effenbeck was ineffective in failing to object to a general intent instruction given at trial, and that Cessna was ineffective for failing to raise the issue on direct appeal.

Sprague complains that "[t]he general criminal intent instruction—PIK Crim. 3d 54.01—was given in this case. Instruction No. 10." He cites *State v. Ellmaker*, 289 Kan. 1132, 1142, 221 P.3d 1105 (2009).

Indeed, instruction No. 10 told the jury:

"Ordinarily, a person intends all of the usual consequences of his voluntary acts. This inference may be considered by you along with all the other evidence in this case. You may accept or reject it in determining whether the State has met its burden to prove the required criminal intent of the defendant. This burden never shifts to the defendant."

The instruction reflected PIK Crim. 3d 54.01 (2004 Supp.).

The district court found that giving this instruction was not error under *Ellmaker*, and that Sprague was not prejudiced if there was any error. We agree.

Sprague takes *Ellmaker* out of context. When the *Ellmaker* court said, "First-degree murder is a specific intent crime, and the instruction should not have been given," 289 Kan. at 1142, the court was referring to a different instruction. It was an instruction based on PIK Crim. 3d 54.01-A.

The *Ellmaker* court's discussion of PIK Crim. 3d 54.01 was more complicated. Ellmaker argued that the instruction based on PIK Crim. 3d 54.01 eroded the specific intent element of premeditated murder by allowing the State to prove merely that he committed the voluntary act of stabbing the victim's throat, without proving that he intended to kill the victim. But the court did not reach the substance of that argument. Ellmaker also argued that the instruction based on PIK Crim. 3d 54.01 could have led the jury to believe that only the voluntary act of stabbing had to be thought over beforehand, not the killing. The court considered all of the instructions together and concluded that the instruction did not mislead the jury into believing the State did not have to prove that Ellmaker premeditated the killing. 289 Kan. at 1144.

The court has since returned to this issue in premeditated murder cases. Each time the court approved the instruction. See *State v. Adams*, 292 Kan. 60, 79-81, 253 P.3d 5 (2011); *State v. Nelson*, 291 Kan. 475, 483-85, 243 P.3d 343 (2010).

"The Pattern Instructions for Kansas (PIK) Crim. 3d 54.01, which states that ordinarily a person intends all of the usual consequences of his or her voluntary acts, does not mislead the jury into believing that the State does not have to prove that the defendant premeditated a killing. PIK Crim. 3d 54.01 contains a permissive inference that may be considered by jurors along with all the other evidence in the case and does not replace the required element of criminal intent necessary for conviction in those cases where criminal intent is a necessary element of the offense. Other standard pattern instructions clearly inform the jury of the State's burden to prove every element, including proving premeditation and an intent to kill." *Adams*, 292 Kan. 60, Syl. ¶ 6.

As in those cases, the jury here was instructed that Sprague "intentionally killed" Kandi and that the "killing was done with premeditation." The instruction did not mislead the jury. Effenbeck was not ineffective for failing to object to instruction No. 10.

Trial and appellate counsel were not ineffective on this point.

Sprague makes a final claim about cumulative error. We reject this because even though he has raised many arguments, we are unconvinced that Sprague is entitled to relief.

Affirmed.